**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| FIRE AND POLICE RETIREE HEALTH CARE FUND, SAN ANTONIO, <br> 11603 W. Coker Loop, Suite 130 <br> San Antonio, TX 78216, <br><br>         Plaintiff <br><br>     v. <br><br> DAVID D. SMITH <br> 1511 Ivy Hill Road <br> Cockeysville, MD 21030-1417 <br> (Baltimore County) <br><br> FREDERICK G. SMITH <br> 7 Timberpark Court <br> Lutherville Timonium, MD 21093-1111 <br> (Baltimore County) <br><br> J. DUNCAN SMITH <br> 1226 Rock Lodge Road <br> McHenry, MD 21541-1241 <br> (Garrett County) <br><br> ROBERT E. SMITH <br> 3600 Butler Road <br> Reisterstown, MD 21136-4813 <br> (Baltimore County) <br><br> HOWARD E. FRIEDMAN <br> 1313 Doves Cove Road <br> Baltimore, MD 21286-1426 | No. ____-_____ <br><br><br><br> **JURY TRIAL DEMANDED** |

1

(Baltimore County)

DANIEL C. KEITH
55 South Port Royal Drive
Hilton Head Island, SC 29928-5509

MARTIN R. LEADER
1318 Round Oak Court
McLean, VA 22101-1829

LAWRENCE E. MCCANNA
6155 Shadywood Road, Unit 205
Elkridge, MD 21075-6063
(Howard County)

CHRISTOPHER S. RIPLEY
7343 Brightside Road
Baltimore, MD 21212-1012
(Baltimore County),

                Defendants

          -and-

SINCLAIR BROADCAST GROUP, INC.
10706 Beaver Dam Road
Hunt Valley, MD 21030,
(Baltimore County),

                Nominal Defendant.

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Fire and Police Retiree Health Care Fund, San Antonio ("Plaintiff San Antonio")

brings this stockholder derivative action in the name of and on behalf of Sinclair Broadcast

Group, Inc. ("Sinclair" or the "Company").   The allegations in this verified stockholder complaint (the "Complaint") are made upon Plaintiff's personal knowledge with regard to its own acts and upon information and belief as to all other matters.   Plaintiff's information and belief is based on, among other things, the investigation of its chosen counsel, which includes review of filings with the Securities and Exchange Commission ("SEC") and Federal Communications Commission ("FCC") and other publicly available information.   Based on the allegations in this Complaint, Plaintiff asserts derivative claims for breach of fiduciary duty against each of the members of Sinclair's board (the "Board") – including David D. Smith, Fredrick G. Smith, J. Duncan Smith, Robert E. Smith, Howard E. Friedman, Daniel C. Keith, Martin R. Leader, and Lawrence E. McCanna (the "Director Defendants") – and certain executives – David D. Smith, J. Duncan Smith, Robert E. Smith, and Christopher S. Ripley (the "Officer Defendants").[1]

## <u>NATURE OF THE ACTION</u>

1.     This is a simple and straight-forward derivative action that seeks to hold the Board – in particular, the Smith brothers – accountable for their actions in connection with the failed merger transaction between Sinclair and Tribune Media Company ("Tribune").   As alleged herein, the Director and Officer Defendants breached their duties of care, loyalty, and good faith

---

[1] Plaintiff's signed verification is attached as Exhibit 1.

by, among other things, (i) engaging in self-dealing transactions for the benefit of the Smith brothers (the Company's controlling stockholders) in violation of FCC rules, and (ii) knowingly misrepresenting and omitting material facts to the FCC in applications submitted to the federal government when seeking regulatory approval of the merger transaction.  As a result of these breaches of duty, the Company has lost a highly accretive merger transaction, faces numerous lawsuits seeking over $1 billion in damages, and is exposed to concrete future harm relating to the renewal and acquisition of additional FCC licenses given its failure to deal candidly with the FCC.

2.     Sinclair is a controlled company under NASDAQ rules.  Since its inception, the Smith brothers – David Smith, Dr. Fredrick Smith, J. Duncan Smith, and Robert Smith – have exercised complete control over the Company's business operations and corporate governance mechanisms.  Given their absolute control, the Company admits in its public filings that the "the Smiths could pursue acquisitions, *divestitures*, or other transactions that, in their judgment, could enhance *their* equity investment, *even though* such transactions might involve risks to our [Sinclair's] *other security holders*."   The Smith brothers' absolute control over the Company's divestitures for their own benefit, at the expense of minority stockholders, is the primary basis for this action.

3.     On May 8, 2017, Sinclair entered into an agreement and plan of merger with Tribune Media Company ("Tribune") for an aggregate purchase price of $3.9 billion (the

"Merger Agreement"), plus the assumption of approximately $2.7 billion in net debt (the "Sinclair-Tribune Merger").   The transaction would give Sinclair ownership over 42 Tribune stations in key markets like New York and Chicago, adding to its existing footprint of more than 190 stations and giving the Company access to nearly three-quarters of U.S. households.

4.      As part of the Merger Agreement, Sinclair, with Board approval, agreed to use its reasonable best efforts to obtain regulatory approval of the transaction, including by divesting certain television broadcast stations to independent third-parties, as required by law.   As expected, the FCC required Sinclair to divest certain stations to avoid triggering FCC limits on national ownership.

5.      Sinclair's efforts in seeking regulatory approval dragged on for more than a year, as Sinclair revised the deal several times, offering to sell off 21 stations in an effort to gain government approval.   In those proposals, Sinclair devised at least two separate proposals to divest certain television broadcast stations to Cunningham Broadcasting Corporation ("Cunningham") and WGN-TV, LLC.

6.      The Board knew that Cunningham and WGN-TV, LLC had extensive ties to Sinclair and were unlikely to be deemed sufficiently independent for purposes of FCC rules.   By way of example, the Smith brothers held an ownership interest in Cunningham.   Further, David Smith was the controlling stockholder of Atlantic Automotive, a company operated by Steven Fader who would also operate WGN-TV, LLC.   The ties between Sinclair, on the one hand, and

Cunningham and Steven Fader (through Atlantic Automotive), on the other hand, were so extensive that the Company's own public filings referred to Cunningham and Atlantic Automotive as "related persons."

7.      Immediately after Sinclair's initial proposal to divest television broadcast stations to Cunningham and WGN-TV, LLC, news organizations criticized the proposed divestitures as "sham transactions."  Importantly, the FCC specifically warned Sinclair that the proposed divestitures were inadequate under FCC rules because Sinclair (in particular the Smith brothers) maintained too close of a relationship to Cunningham and WGN-TV, LLC.

8.      In the face of this specific warning, Sinclair submitted "new" proposed divestitures in an attempt to cure the FCC's concerns.  However, the Board's new plan did nothing to change the most problematic aspects of the earlier divestitures.  Specifically, Sinclair remained steadfast in its proposal to divest certain television broadcast stations to the same conflicted entities, Cunningham and WGN-TV, LLC.  News reports once again immediately criticized Sinclair for failing to fix the problems previously identified by the FCC.  Some critics again called the divestiture plan a "total sham."  The Board did nothing in response.

9.      Thereafter, the FCC sought public comment on Sinclair's proposal.  Those comments highlighted the fact that Sinclair had failed to disclose in its FCC applications certain material facts concerning the divestitures, including the full extent of the Smith brothers' business relationship with Steven Fader and Cunningham.  In short, the public comments raised

very serious concerns that the Director and Officer Defendants submitted false statements to a federal regulatory agency.

10.     The FCC agreed with the public comments.  In advance of formal FCC action, Commissioner Ajit Pai issued a public statement expressing his concerns about Sinclair's proposed divestitures: "Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction."  He went on to state, "[t]he evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."

11.     On July 19, 2018, the FCC released a Hearing Designation Order, unanimously adopted by the Commissioners, that sent review of the Sinclair-Tribune Merger to an administrative judge.  According to news sources and the FCC, the decision to send the Sinclair-Tribune Merger for administrative review was a *de facto* death sentence for the merger transaction.

12.     In the hearing designation order, the FCC noted that the Sinclair-Tribune Merger would not serve the public interest, stating it took issue with the proposed divestiture plans offered by Sinclair.  Based on the related-party entanglements between and among Sinclair, the Smith brothers, Steven Fader, and Cunningham – which Sinclair purposely failed to disclose in either the merger application or the divestiture applications – the FCC's Order concluded that:

    [S]ubstantial and material questions of fact have been raised regarding whether

Sinclair was the real party-in-interest to the WGN-TV, KDAF, and KIAH application and, if so, *whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission*…. *We note that Sinclair … did not fully disclose facts such as the pre-existing business relationships between Fader, Smith, and Sinclair nor the full entanglements between Cunningham, Smith, and Sinclair.* As such there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts with the intent to consummate this transaction without fully complying with our broadcast ownership rules.

13.     The Director and Officer Defendants' insistence on fashioning related party transactions for the benefit of the Smith brothers, at the expense of minority stockholders, has resulted in substantial harm to the Company.  On August 9, 2018, Tribune announced that it had terminated the Merger Agreement, depriving Sinclair stockholders of a highly accretive merger transaction.

14.     Subsequently, Tribune filed suit in the Court of Chancery for the State of Delaware alleging that Sinclair breached the Merger Agreement by willfully failing to use reasonable best efforts to obtain regulatory approval, including by exhibiting a lack of candor with the FCC.

15.     Numerous stockholders have brought securities class actions in connection with the failed Sinclair-Tribune merger transaction.  The complaints allege that Sinclair issued materially false and misleading statements regarding the proposed divestitures and the Company's progress in seeking regulatory approval of the transaction.

16.     Although a stockholder typically must make a demand on the board of directors

before suing in the name of the Company, here, demand is plainly futile.  The Smith brothers, whom the related party transactions were designed to personally benefit, constitute four of the eight members of the Board, and therefore a majority of the Board cannot impartially assess and vote to pursue the claims asserted herein.  Under traditional rules of board governance, an equally divided vote on a motion to sue has the same effect as a vote in which the motion is defeated by a one vote majority.  In either case, the motion is unsuccessful and does not become corporate policy.  For this reason, because a majority of the Board is not independent and disinterested, the Board is so personally conflicted and committed to the failed transactions at issue herein that they could not be expected to respond to a demand in good faith and within the ambit of the business judgement rule.

17.    Moreover, the remaining directors are incapable of impartially assessing a demand because they are so personally and directly conflicted due to the Smith brothers' domination and control over the Board.  As alleged herein, and based on public statements **by the Company in its SEC filings**, the Smith brothers are the controlling stockholders of Sinclair with the power and authority to act to promote their own self-interests over the interests of the Company and its minority stockholders.  The Board admits that the Smith brothers can take such action and, as alleged herein, did take such action, despite it representing a blatant breach of fiduciary duty.  For this reason, the remaining directors are so committed to the transactions due to the Smith brothers' domination and control over Sinclair that they are incapable of assessing a

demand in good faith.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S. Code § 1332.  Plaintiff is a retirement system created pursuant to statute of the State of Texas and provides services almost entirely to the City of San Antonio, Texas.  Plaintiff has the capacity to sue and be sued in its own name.  None of the Defendants is a citizen of Texas and the amount in controversy exceeds $75,000.

19.     This Court has jurisdiction over each Defendant because Sinclair is incorporated and organized under the laws of Maryland and headquartered in Hunt Valley, Maryland and the Director and Officer Defendants are directors and officers of Sinclair, a Maryland company. Further, each defendant has minimum contacts with Maryland, as he has authorized acts that have had a sufficient impact on Sinclair and Sinclair's stockholders in Maryland to support this Court's personal jurisdiction over them.

20.     This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiff

22.     **Plaintiff San Antonio** is a current holder of Sinclair common stock and has owned Sinclair common stock continuously since April 19, 2017.

**Nominal Defendant**

23.     **Nominal Defendant Sinclair** is a Maryland corporation with its principal place of business located in Hunt Valley, Maryland.   Sinclair is a publicly traded telecommunications conglomerate that is controlled by the family of the Company's founder, Julian Sinclair Smith. The Company is the largest television station operator in the United States by number of stations, and largest by total coverage: owning and/or operating a total of 191 stations across the United States in over 100 markets (covering 40% of American households).

**Director and Officer Defendants**

24.     **David D. Smith** was instrumental in the formation of Sinclair in 1986.  He has served as Executive Chairman since January 2017 and Chairman of the Board since September 1990.  David Smith also served as President and Chief Executive Officer from 1988 until January 2017.  David Smith also serves as a member of the board of directors of Atlantic Automotive Corporation ("Atlantic Automotive").  David Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of Fredrick, Duncan, and Robert Smith.

25.     **Dr. Fredrick G. Smith** has served as Vice President since 1990 and Director since 1986.  Dr. Fredrick Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Duncan, and Robert Smith.

11

26.     **J. Duncan Smith** has served as Vice President, Secretary, and Director since 1986.  Duncan Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Fredrick, and Robert Smith.

27.     **Robert E. Smith** has served as a Director since 1986.  He served as Vice President and Treasurer of Sinclair from 1988 to June 1998, at which time he resigned from his position as Vice President and Treasurer.  Robert Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Fredrick, and Duncan Smith.

28.     **Howard E. Friedman** has served as a Director since January 2015.

29.     **Daniel C. Keith** has served as a Director since May 2001.  Mr. Keith is the President and Founder of the Cavanaugh Group, Inc., a Baltimore-based investment advisory firm founded in October 1995.  In his role as investment advisor, Mr. Keith has provided investment and management services to three of the Smith brothers and certain corporations owned by one of more of them.

30.     **Martin R. Leader** has served as a Director since May 2002.  He also served as a member of the board of directors of Atlantic Automotive until February 2006.  Mr. Leader is a retired partner of the law firm Shaw Pittman in Washington, D.C., where he specialized in communications law matters from 1999 to 2002.  Mr. Leader was a senior partner with the law firm of Fisher Wayland Cooper Leader & Zaragoza in Washington, D.C. from 1973 to 1999.  According to the Company's press release announcing Mr. Leader's appointment to the Board in

2002, from 1968 to 2002, Mr. Leader served as outside FCC counsel to Sinclair and its predecessor companies.

31.     **Lawrence E. McCanna** has served as a Director since July 1995.  Mr. McCanna was a shareholder of the accounting firm of Gross, Mendelsohn & Associates, P.A. from 1972 and served as its managing director through June 30, 2009.   Mr. McCanna has provided accounting, tax, and related services to the Smith family and corporations owned by them (other than Sinclair).

32.     **Christopher S. Ripley** has served as President and Chief Executive Officer since January 2017.   From April 2014 to January 2017, he served as Chief Financial Officer of the Company.

33.     David D. Smith, Dr. Fredrick G. Smith, J. Duncan Smith, and Robert E. Smith are collectively referred to herein as the "Smith brothers."

34.     David D. Smith, Fredrick G. Smith, J. Duncan Smith, Robert E. Smith, Howard E. Friedman, Daniel C. Keith, Martin R. Leader, and Lawrence E. McCanna are collectively referred to herein as the "Director Defendants" or the "Board."

35.     David D. Smith, Fredrick G. Smith, J. Duncan Smith, and Christopher S. Ripley, are collectively referred to herein as the "Officer Defendants."

**Relevant Non-Parties**

36.     **Atlantic Automotive** is a holding company of MileOne Autogroup, a network of

40 auto dealerships in Maryland, Pennsylvania, Virginia, and North Carolina.   Since at least 1997, Steven Fader has acted as CEO of Atlantic Automotive.   Sinclair was previously a 17.5% owner of Atlantic Automotive, before selling its stake in 2005.   Both David Smith and Martin Leader, current directors of Sinclair, served as directors of Atlantic Automotive while Sinclair had an ownership stake in the company. Steven Fader and David Smith remain close business partners.

37.   David Smith retained a controlling interest in Atlantic Automotive after Sinclair sold its stake in February 2006.   He also continues to serve as a board member of Atlantic Automotive.   Further, Atlantic Automotive is a Sinclair advertiser and tenant.   Given these connections, Sinclair admits in its public filings that Atlantic Automotive is a "related person."

38.   **Cunningham Broadcasting Corporation** ("Cunningham") was formed in 1994 as Glencaire, Ltd., and was headed by Edwin Edwards, a former Sinclair executive. Cunningham is a television company that, together with its subsidiaries, owns and/or operates 20 television stations in eighteen markets across the United States.   The initial capital investment to establish Cunningham was provided by Carolyn Cunningham Smith, wife of Sinclair founder Julian Smith and mother of David Smith, Dr. Fredrick Smith, Duncan Smith, and Robert Smith. In 2001, the company changed its name to Cunningham Broadcasting Corporation, which was named after Carolyn Cunningham Smith.

39.   The Smith family has held a controlling interest in Cunningham since its

formation.  In January 2018, the estate of Carolyn Smith sold the voting stock in Cunningham to Michael Anderson, a longtime banker for David Smith, for a below-market price of $400,000. The Smith brothers retain an option to repurchase their interest in Cunningham.

40.     According to public sources, Cunningham was created by Sinclair in order to skirt FCC ownership rules.   Cunningham has a history of buying divestitures from Sinclair accompanied by "sidecar agreements" (further defined below) that allow Sinclair to continue exercising control over the divested TV stations.  Moreover, to fund the purchase of divestitures, Sinclair has provided Cunningham with access to substantial liquidity in the form of debt.  As of 2018, Cunningham owed Sinclair approximately $53 million.   Given the close connections between and among Sinclair, the Smith family, and Cunningham, the Company likewise admits in its public filings that Cunningham is a "related person."

## SUBSTANTIVE ALLEGATIONS

### I.     BACKGROUND

#### A.     Sinclair is Controlled by the Smith Family

41.     Sinclair is one of the largest television broadcasting companies, with a broadcast distribution platform consisting of 191 stations in 89 markets, which Sinclair either owns outright; provides programming and operating services to, pursuant to agreements commonly referred to as local marketing agreements ("LMAs"); or provides sale services and other non-programming operating services to, pursuant to other outsourcing agreements (such as joint sales

agreements ("JSAs") and shared services agreements ("SSAs")).

42.     Sinclair (formerly Chesapeake Television Corporation) was founded by Julian Sinclair Smith in 1971.  Julian Smith is the late father of David, Fredrick, Duncan, and Robert Smith.  In or around 1986, Julian Smith's health started to decline, prompting all four Smith brothers to join the family business.  Robert acted as treasurer, Fredrick as director and Duncan as secretary and director.  David Smith was tapped to become CEO in 1988 and became chairman two years later, in 1990.   In 1995, around the time it went public, the Company changed its name to Sinclair Broadcasting.

43.     Since inception, the Smith family has had complete control over Sinclair.  News organizations have reported that David Smith and his three brothers – Fredrick, Duncan, and Robert – "maintain iron-clad control" over Sinclair through preferential voting shares, majority presence on the Board, and long-term positions as executives of Sinclair.

44.     Sinclair has two classes of stock – Class A, which is entitled to one vote per share; and Class B, which is entitled to ten votes per share.  The Smith brothers own all the Company's Class B stock and roughly 33% of the Company's Class A stock, providing them with over 74% of the vote.  Thus, the Smith brothers have the right and power to control all matters brought to a stockholder vote, including the selection and election of all directors.

45.     According to the Company's Proxy Statement, the Smith brothers have entered into a stockholders' agreement pursuant to which they have agreed to vote for each other as

candidates for election to the Board until December 31, 2025. As a result, four of the Company's current eight directors are members of the Smith family. Given the presence of a majority of directors affiliated with the Smith family, the Board has determined that Sinclair is a controlled company for purposes of NASDAQ listing requirements, which means the Board need not have an independent majority.

46. Further, the Smith brothers have been the Company's executive officers and/or directors at all times since Sinclair became a public company in 1995. Currently, David Smith, Dr. Fredrick Smith, and Duncan Smith are executive officers and directors and Robert Smith is a director. As executive officers, the Smith Brothers have absolute say over the Company's day-to-day operations.

47. The Company also admits that the Smith brothers have the power to exert inordinate amounts of power over Sinclair, even if doing so would result in harm to minority stockholders. According to the Company's 2017 Form 10-K, filed on March 1, 2018, the Company admits that "circumstances may occur in which the interests of the Smiths, as controlling security holders, could be in conflict with the interests of other security holders and the Smiths would have the ability to cause [Sinclair] to take actions in their interest." Importantly, the Company further admits that "the Smiths could pursue acquisitions, divestitures, or other transactions that, in their judgment, could enhance *their* equity investment, *even though* such transactions might involve risks to [Sinclair's] *other security holders*."

**B.      Sinclair's History of Expansion and Skirting FCC Rules**

48.      Throughout his time as an executive of Sinclair, David Smith focused on expanding Sinclair's reach across the United States.  While the Company had a small footprint in four cities in 1986, David Smith ultimately grew the Company's reach to nearly 40% of United States households.   As noted above, Sinclair has grown to be one of the largest television broadcast companies in the nation.

49.      Sinclair's rapid expansion did not come without regulatory risks and penalties. Under antitrust laws and FCC ownership rules, television broadcast licensees are limited in the number of stations the company can own within specific demographic market areas ("DMAs") and throughout the nation.  Although these rules have changed over time, the primary restrictions limit the number of television stations owned by any one company to curb monopoly power and ensure diversity in local programming.

50.      Since the Company began rapidly expanding in the late 1990s, the Company began to receive pushback from regulators.  In many transactions, Sinclair's acquisitions would have resulted in the Company exceeding legal ownership thresholds.  To avoid triggering legal limits, regulators required Sinclair to divest certain stations in order to comply with antitrust laws and FCC rules.

51.      Rather than fully divest the television stations, however, Sinclair devised ways to keep control over the divested stations using legal loopholes known as sidecar arrangements.

18

Sinclair would set up a shell company that would agree to buy the television broadcast license, and Sinclair would remain responsible for most of the television station's operations.  Sidecar arrangements typically entail several agreements[2] whereby the senior partner in the agreement (*i.e.*, Sinclair) buys a television station's facilities and assets but sells the license to a junior partner (*i.e.*, an affiliated shell company).  Under these sidecar agreements, Sinclair generally retained control over the finances, personnel, and programming of the station.  According to Media Matters, pursuant to sidecar arrangements, Sinclair operated 48 stations in 23 states as of July 2018.

52.      The Director and Officer Defendants knew that regulators were skeptical of deals that leave one broadcaster entangled in a station's operations because Sinclair has faced regulatory fines for maintaining *de facto* control over certain sidecar entities.  For instance, in 2001, Sullivan Broadcast Holdings, Inc. proposed to sell its television stations to Sinclair and Cunningham (then known as Glencairn).  The FCC ruled that Sinclair entered into transactions with Cunningham that were not executed at arms-length, allowing Sinclair to exercise *de facto* control over Cunningham.  *See In the Matter of Edwin L. Edwards and Carolyn Smith et. al*, (the

---

[2] According to Sinclair's public filings, the Company has entered into agreements with other stations in certain markets, through which Sinclair provides programming and operating services pursuant to local marketing agreements (LMAs) or provide sales services or other non-programming operating services pursuant to outsourcing agreements, such as joint sales agreements (JSAs) and shared service agreements (SSAs).

"*2001 Glencairn Decision*").  As a result, Sinclair and Glencairn were required to pay $80,000 in fines to the FCC.

53.     In recent years, the Director and Officer Defendants have known that the FCC has taken an even harder line on sidecar arrangements, attributing sidecar stations to Sinclair under certain circumstances.   For example, in 2014, under FCC Chairman Tom Wheeler, the Commission began to increase scrutiny regarding the use of sidecar arrangements to evade its policies.  The FCC started to make JSAs count as ownership if the senior partner (e.g., Sinclair) sold 15% or more of the advertising for its junior partner (the shell company), and to ban coordinated retransmission consent[3] negotiations between two of the top four stations in the market.  Chairman Wheeler also indicated that he planned to address local marketing and shared services agreements in the future.  The Company's public filings, signed by the Board, disclosed the FCC's recent regulatory changes, and therefore the Board was aware of the FCC's increased scrutiny of sidecar arrangements.

54.     The Director and Officer Defendants were also specifically aware of the FCC's renewed regulatory interest in examining sidecar arrangements.  For example, in July 2016, the

---

[3] Retransmission consent is a provision of the 1992 United States Cable Television Consumer Protection and Competition Act that requires cable operators and other multichannel video programming distributors to obtain permission from broadcasters before carrying their programming.  Generally, cable operators negotiate fees paid to broadcasters in order to receive consent to carry the broadcasters' programming.

FCC announced that Sinclair would pay $9.485 million to resolve several investigations, including the FCC's investigation into whether Sinclair had illegally renegotiated retransmission consent agreements for third party companies that Sinclair allegedly did not control. The FCC's retransmission consent rules prohibit a broadcaster from negotiating jointly for one of its stations and for another station in the same market that it does not control. According to the FCC's investigation, Sinclair had negotiated retransmission consent on behalf of dozens of stations that it did not control while it was negotiating for its own stations in the same market.

55. Thus, since at least 2001, the Director and Officer Defendants have known that Sinclair's use of questionable third-party entities and sidecar agreements resulted in numerous fines by the FCC, all of which put the Company's fiduciaries on notice of the importance of divesting stations to independent third-party companies (without strings attached) in order to comply with FCC rules in connection with merger transactions.

## II.    THE MERGER TO CREATE THE LARGEST TELEVISION STATION OPERATOR IN THE UNITED STATES

### A.    Sinclair and Tribune Media Company Announce a Highly Accretive Merger Transaction

56. On May 8, 2017, Sinclair entered into an agreement and plan of merger to acquire Tribune Media Company ("Tribune") for an aggregate purchase price of $3.9 billion (the "Merger Agreement"), plus the assumption of approximately $2.7 billion in net debt (the "Sinclair-Tribune Merger"). Under the terms of the Merger Agreement, Tribune stockholders

would receive $35.00 plus 0.23 shares of Sinclair Class A stock (or approximately $43.50 per share).

57.     Sinclair's acquisition of Tribune was the largest acquisition in the Company's history.   The acquisition of Tribune included 42 stations in 33 markets, WGN America and Prime Real Estate as well as equity stakes in TV Food Network and CareerBuilder.   Combined, Sinclair and Tribune would have over $4.3 billion in revenue and cover 72% of the households in the United States across 108 markets, including 39 of the top 50 designated marketing areas ("DMAs") based on audience measurements complied by Nielsen Media Research.

58.     In the press release announcing the merger transaction, Chris Ripley, Sinclair's CEO, noted the benefits of the merger: "The Tribune stations are highly complementary to Sinclair's existing footprint and will create a leading nationwide media platform that includes our country's largest markets. The acquisition will enable Sinclair to build ATSC 3.0 (Next Generation Broadcast Platform) advanced services, scale emerging networks and national sales, and integrate content verticals. The acquisition will also create substantial synergistic value through operating efficiencies, revenue streams, programming strategies and digital platforms."

59.     Thereafter, in an investor call and accompanying presentation, Sinclair touted the merger transaction as "highly accretive" to Sinclair stockholders.   CEO Ripley projected that Tribune's core business would have "expected pro forma EBITDA of at least $650 million" and that "free cash flow per share will be over 40% accretive."   Sinclair also informed stockholders

that the Sinclair-Tribune merger would create a "substantial synergy opportunity," with some analysts estimating $250 to $270 million in total synergies. Overall, Sinclair stockholders stood to gain substantially from the acquisition of Tribune.

**B.     The Sinclair-Tribune Merger Raises Serious (But Manageable) Regulatory Issues**

60.     As noted above, Sinclair stood to significantly expand its national footprint by acquiring Tribune.  Upon consummation of the merger transaction, Sinclair's television broadcast company would reach 72% of United States households.  Although this massive reach provided benefits to Sinclair and its stockholders, the percentage ownership (along with ownership of overlapping stations in certain DMAs) created issues for Sinclair in connection with receiving federal regulatory approval.

61.     Two specific rules were implicated by the Sinclair-Tribune merger transaction – the Local TV Multiple Ownership Rule (the "Duopoly Rule") and the National TV Ownership Rule (the "National Cap Rule").  Under the Duopoly Rule, an entity is permitted to own up to two TV stations in the same DMA if either: (1) the service areas of the stations do not overlap, or (2) at least one of the stations is not ranked among the top four stations in the DMA (based on audience share), and at least eight independently owned TV stations would remain in the market after the proposed combination.  Under the National Cap Rule, an entity is prohibited from

owning a collective station group that exceeds 39 percent of all United States TV households.[4]

62.     Thus, when a merger results in a company triggering either the Local TV Multiple Ownership Rule or the National TV Ownership Rule, the acquiring company must divest certain TV stations to ***independent third parties*** to avoid violating these FCC rules.  The FCC will look to the actual substance of the divestiture to determine whether the transaction is arms'-length. Where a company's ties to the seller are too close, the FCC can declare that the seller has *de facto* control over the buyer and attribute the station to the seller.

63.     Consistent with these FCC Rules, Sinclair agreed to divest certain stations to avoid triggering the National TV Ownership Rule.  First, Sinclair agreed that WGN-TV Chicago, owned by Tribune, would be divested in the event requested by federal regulators.  Second, Sinclair agreed to designate other station divestitures as necessary in order to comply with the National Cap Rule.

64.     In addition to the specific divestitures outlined in the Merger Agreement, Sinclair agreed to take all actions necessary to receive regulatory approval of the merger transaction, provided those actions were compliant with federal law.  For instance, pursuant to Section 7.1(a) of the Merger Agreement, Sinclair agreed to "use its best efforts to take, or cause to be taken, all

---

[4] For purposes of calculating the "national audience reach," TV stations on UHF channels (14 and above) count less than TV stations operating on VHF channels (13 and below).  This is known as the UHF Discount.

actions and to do, or cause to be done, all things necessary, proper or advisable **under applicable Law** to consummate and make effective the Merger."

65.     Further, pursuant to Section 7.1(i), Sinclair agreed to "use reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable Closing to occur as soon as reasonably practicable," including efforts to avoid the entry of any permanent or temporary government order that would delay or prohibit the consummation of the transaction.

## III.   SINCLAIR ONCE AGAIN ATTEMPTS TO SIDESTEP FCC RULES USING SHAM TRANSACTIONS

### A.     Sinclair's Proposed Divestiture Plan to the FCC

66.     On February 20, 2018, Sinclair filed a proposal with the FCC for station divestitures designed to avoid triggering FCC rules.  Sinclair planned to divest, among other stations, (i) the WPIX New York station to Cunningham, and (ii) WGN-TV Chicago to WGN-TV, LLC, a newly formed entity operated by Steven Fader.    However, the proposed "divestitures" were not divestitures at all but were instead insider deals with buyers connected to Sinclair and the Smith brothers personally.

67.     For instance, Sinclair applied to divest WPIX-TV New York to Cunningham for $15 million.   The WPIX divestiture raised serious concerns about the arms-length nature of the transaction.  Sinclair was selling one of Tribune's most valuable assets to an insider for a mere

$15 million, far below its market value.

68.     Sinclair also applied to divest WGN-TV Chicago to WGN-TV, LLC for $60 million.  WGN-TV LLC was a newly-formed entity established by Steven Fader, a car dealer with business ties to David Smith.  Fader had no broadcast experience, which was precisely why Sinclair chose him to "purchase" WGN to allow for maximum control.

69.     Sinclair's proposed operating agreements with Cunningham and Fader further suggested that Sinclair employees would have responsibility for the "divested" stations' operations, including advertising sales and retransmission consent negotiations; Sinclair would reap most of the economic benefits of the stations it was "divesting," including retransmission revenues; and Sinclair would have an option to repurchase the stations in the future for little to no increase in price.

70.     Within a week of submitting the FCC applications, news outlets published numerous articles expressing concern about the self-dealing and related-party nature of Sinclair's proposed divestitures of WGN-TV and WPIX-TV.[5]  According to *Variety*, "[t]he sale price of $15 million for a VHF station in the nation's largest TV market [New York] and $60 million for

---

[5] *See, e.g.*, Robert Channick, CHICAGO TRIBUNE, *Sinclair deal to sell WGN to chairman's business partner gives broadcaster control* (Mar. 1, 2018); Ben Munson, FIERCEVIDEO, *Sinclair plans $60M sale of WGN-TV to chairman's business partner* (Mar. 2, 2018); Cynthia Littleton, VARIETY, *Sinclair's 'Brazen' Plan to Sell New York, Chicago Stations With Strings Attached Draws Criticism* (Mar. 3, 2018); Gina Hall, NEW YORK BUSINESS JOURNAL, *Sinclair takes next steps to sell WGN-TV Chicago and WPIX-TV New York* (Mar. 7, 2018).

a VHF station in the No. 3 market [Chicago] was described as 'comical' by a broadcast TV veteran."  The article noted that back in 2002, Fox paid $425 million to acquire WPWR-TV Chicago, a UHF station that was not nearly as strong in the market as WGN-TV.

71.     Further, Craig Aaron, president of the Washington, D.C.-based Free Press told Variety, "[t]his is their [Sinclair's] most brazen flouting of existing FCC rules."  He went on to state, "The only role these supposed owners have is to sign everything away to Sinclair including all profits.  These sham deals are in place only long enough so that Sinclair can lobby hard enough to get rid of the (ownership) rules and buy the stations back."

**B.     The FCC Balks at Sinclair's Proposed Divestitures and Issues a Stern Warning**

72.     After the filing of the divestiture applications, the Director and Officer Defendants were made aware of the FCC's concerns relating to whether the WPIX-TV and WGN-TV divestitures were in fact made to independent third-parties.

73.     According to the *Wall Street Journal*, Sinclair was "encountering resistance from the [FCC]" given its close business ties to "the potential new owners of the spun-off stations."[6] The *WSJ* noted that "[b]oth purchasers have long ties to Sinclair and its executive chairman, David Smith." According to a person familiar with the matter, "[t]he FCC want[ed] safeguards in

---

[6] David Smith was aware of the *Wall Street Journal* reporting, as the article explicitly states that the reporter reached out to him seeking comment.

the sidecar contracts that would limit Sinclair's ability to influence the operations of the stations." Further, there was also "concern at the FCC that Sinclair [was] selling the stations for below market prices given that they are two of the most-valued assets of the Tribune portfolio."

74.     Sinclair's proposal was so provocative that the FCC staff refused even to put Sinclair's proposed sales of WPIX-TV to Cunningham, and WGN-TV to Fader, out for public comment. According to Tribune, at the time, "[i]n the staff's view, Sinclair's entanglements with the buyers and the terms of the operating agreements meant that the station sales could readily be viewed as 'sham' transactions."

75.     Thus, as of at least March or April 2018, the Director and Officer Defendants received a clear warning from the FCC to avoid related party transactions involving Cunningham and WGN-TV, LLC. Any director acting in good faith would have complied with the law to ensure that the Company's highly accretive merger would receive regulatory approval. In response, however, the Director and Officer Defendants did nothing to address the FCC's concerns. Rather, as discussed in the next section, Sinclair chose to "double-down" on its proposed divestitures to these same entities, despite general and specific warnings that such a strategy would doom the Sinclair-Tribune merger transaction.

### C.     Sinclair (Again) Fails to Heed the FCC's Warnings

76.     On April 25, 2018, Sinclair filed an amended application with the FCC detailing the purported divestiture of six stations to comply with local and national FCC ownership rules.

Sinclair proposed three divestitures (to two entities) that are of particular importance.

77.    ***First,*** Sinclair opted to rescind the divestiture of WPIX-TV New York.  In its place, Sinclair proposed the sale of two Texas television stations, KIAH in Houston and KDAF in Dallas, to Cunningham for approximately $60 million.  Sinclair retained an option to repurchase both stations, and Sinclair had simultaneously entered into various service agreements, allowing the Company to effectively exercise control over these stations.  However, Sinclair's disclosures to the FCC omitted key facts regarding the relationship between Sinclair and Cunningham.

78.    Cunningham agreed to purchase KDAF (Dallas) and KIAH (Houston) for substantially below what they were worth, even considering Sinclair's position of needing to divest the assets.  Cunningham agreed to purchase the two stations for $60 million (by some accounts, ***more than $40 million***, or 40%, below market value).  By comparison, Sinclair previously proposed to sell KPLR-TV in St. Louis to Meredith Corporation for $65 million. However, with respect to market size, KDAF was in the 5th largest DMA and KIAH was in the 7th largest DMA, while KPLR was in the 21st largest DMA.  Thus, despite the far greater value of the stations, Cunningham was paying for them as if they were worth less than half of KPLR.

79.    ***Second***, Sinclair proposed the sale of WGN-TV Chicago to WGN-TV, LLC for $60 million.  Sinclair retained an option to repurchase the station, and Sinclair had simultaneously entered into various service agreements, allowing the Company to effectively

exercise control over these stations.  Again, these disclosures to the FCC were misleading and omitted material facts regarding the relationship between Sinclair and WGN-TV, LLC.

80.     Sinclair's relation to WGN-TV, LLC, and continued control over the company, help explain why the Company was willing to sell WGN-TV for far below fair value.  Sinclair agreed to sell WGN-TV for $60 million.  However, news reports at the time noted that a "brand like WGN in the nation's third biggest media market" should have fetched a price close to $100 million or $150 million.

81.     The planned divestitures, devised by the Smith brothers and approved by the Director Defendants, were related party transactions entered into for the benefit of the Smith brothers.  As the Company readily admitted, "the Smiths could pursue acquisitions, divestitures, or other transactions that, in their judgment, could enhance *their* equity investment, *even though* such transactions might involve risks to our [Sinclair's] *other security holders*."  Although the Company disclosed the likelihood of breaches of fiduciary duty by the Smith brothers, such a disclosure does not absolve the Smith brothers (and the Director Defendants) of the unlawful act of preferring the Smith brothers' interests over those of the Company and its minority stockholders.

82.     Further, the Smith brothers and Directors Keith and McCanna knew that the planned divestitures were related party transactions in violation of FCC rules because all six of those directors had served on the Board since at least November 2001, when the FCC issued its

*2001 Glencairn Decision*.  As noted above, Sinclair had already been found to exercise *de facto* control over Cunningham (at the time, Glencairn, Ltd.) and, as a result, been subject to fines by the FCC.  The *2001 Glencairn Decision* notified the relevant Board members that the FCC would find *de facto* control to exist where, as here, the transaction is far below fair value and Sinclair remained in control through sidecar arrangements and assumption of Cunningham's debt.

83.    Moreover, the Director and Officer Defendants had knowledge that Cunningham and WGN-TV, LLC were considered, by the Company's own admission, "related persons."  In each and every public filing leading up to the submission of Sinclair's divestiture applications, the Company publicly identified Cunningham and Atlantic Automotive, run by Steven Fader, as "related person[s]" due to extensive connections and ties with the Company's controlling stockholders, the Smith brothers.[7]  The Director Defendants had signed the Company's Form 10-Ks on February 28, 2017 and March 1, 2018 – both of which pre-dated submission of the FCC divestiture applications – that included a description of Cunningham's and Atlantic

---

[7] Sinclair Form 10-K, at F-44-45 (filed on Feb. 28, 2017) (identifying "Cunningham Broadcast Corporation" and "Atlantic Automotive Corporation" as related persons); Sinclair Form 10-Q, at 21-22 (filed on May 10, 2017) (same); Sinclair Form 10-Q, at 22-23 (filed on Aug. 9, 2017) (same); Sinclair Form 10-Q, at 24-25 (filed on Nov. 8, 2017) (same); Sinclair Form 10-K, at F-39-40 (filed on Mar. 1, 2018) (same); Sinclair Form 10-Q, at 22-23 (filed on May 10, 2018) (same).

Automotive's entanglements with Sinclair.

84.     The Director and Officer Defendants also had seen red flags notifying them that the proposed divestitures would not receive regulatory approval as recently as early April 2018, when the FCC had warned Sinclair that the Sinclair-Tribune merger transaction would not be approved **unless Sinclair ensured appropriate distance and independence from the companies to which the divestitures would be made.**

85.     News reports immediately criticized Sinclair for failing to fix the problems previously identified by the FCC earlier that month.[8]   Some critics called the divestiture plan a "total sham."   Other commentators drew the obvious comparison to the *2001 Glencairn Decision* in which the FCC shot down a set of sidecar deals between Sinclair and Cunningham, citing, in part, sales prices that were too low.   Regulators had previously ruled that such low prices indicated that the deals were not legitimate, "arms-length" transactions.

86.     Thereafter, on May 24, 2018, the American Cable Association filed a letter with the FCC complaining that Sinclair had failed to disclose necessary information to determine whether the Company retained *de facto* control over Cunningham and WGN-TV.   As American Cable Association stated, "Sinclair withheld more than 250 agreements, schedules, exhibits, and

---

[8] CRAIN'S CHICAGO BUSINESS, *Sinclair agrees to sell WGN—but would still control it* (April 24, 2018); Ben Wofford, ROLLINGSTONE, *Sinclair Broadcasting's Hostile Takeover* (April 24, 2018); Jason Schwartz, POLITICO, *Armstrong Williams got 'sweetheart' deal from Sinclair* (June 13, 2018).

related documents, including materials that appear to contemplate ongoing relationships between Sinclair and the parties to whom it will putatively divest stations." It was clear that Sinclair, at the behest of the Director and Officer Defendants, had determined to misrepresent and omit key facts from its FCC filings in order to facilitate approval of a merger transaction structure that violated FCC rules.

87. In response to public criticism of the sham transactions, and without disclosing all facts to the FCC, Sinclair emphatically responded with more falsehoods, but this time to stockholders. In public statements, Sinclair reassured investors that "***Cunningham is operated completely separately from Sinclair . . . Sinclair will have no involvement in the operations of the Dallas and Houston stations being sold to Cunningham.***" Even more egregiously, Sinclair went further, stating "***Ownership rules are not being evaded; they are being complied with.***" The Director and Officer Defendants, however, knew that the true extent of the relationships between Sinclair, on the one hand, and Cunningham and Fader, on the other hand, had not been disclosed to the FCC and that the proposed divestitures constituted sham, related party transactions in violation of FCC rules.

88. Therefore, despite repeated warnings, the Director and Officer Defendants continued to pursue a divestiture plan in bad faith and in violation of FCC rules. These fiduciaries decided to pursue a strategy in the interests of the Smith brothers, and at the expense of minority stockholders, with knowledge of the high risk that the FCC would block the merger

transaction.  During this time, the Director and Officer Defendants did nothing to ensure that Sinclair would: (i) pursue divestitures in compliance with FCC rules, (ii) submit truthful applications to the FCC, (iii) abide by the terms of its contractual agreement with Tribune to use best efforts to obtain regulatory approval, or (iv) issue truthful public disclosures regarding the Company's efforts to comply with FCC requests for lawful divestitures.

## IV.   SINCLAIR'S OMISSIONS AND MISREPRESENTATIONS RESULT IN A "*DE FACTO* MERGER DEATH SENTENCE"

### A.   Public Comment Leads the FCC to Inform Sinclair That the Merger Would Not Be Approved; Sinclair Scrambles and Admits Fault

89.     On May 21, 2018, the FCC solicited public comment on the amended merger transaction and all of the proposed divestitures.  The related-party "sales" to Fader (WGN-TV) and Cunningham (KIAH and KDAF) met broad and intense public opposition during the period for public comment, which lasted until July 12, 2018.

90.     Public comments on Sinclair's proposals brought to the FCC's attention the fact that Sinclair had failed to disclose in its applications to the Commission certain material facts, including the full extent of the Smith brothers' business relationship with Fader, Sinclair's guarantee of Cunningham's debt, the sale in early 2018 of Cunningham's voting shares to Michael Anderson (a close Sinclair associate), and the suspiciously cheap option to buy those shares given to members of the Smith family.

91.     Following public comment on the proposed divestiture applications, on July 16,

34

2018, FCC Chairman Ajit Pai released a statement announcing the circulation to his fellow FCC commissioners of a draft order that would send review of the Merger to an administrative judge. Chairman Pai stated that:

> Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction. The evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow **Sinclair to control those stations in practice, even if not in name, in violation of the law.**

92.     Later that day, media outlets reported that Chairman Pai had circulated a draft hearing designation order to other Commissioners contending that Sinclair had provided inaccurate and incomplete information to the FCC in connection with the Fader and Cunningham divestiture applications and that a majority of the Commissioners had voted to refer the applications to an administrative law judge.

93.     On July 18, 2018, in response to public statements of Chairman Pai and public reports of Chairman Pai's plans, Sinclair withdrew the divestiture applications for the three stations to be sold to Cunningham and Steven Fader. At the same time, Sinclair informed the Commission it would keep WGN for itself and work to find an independent buyer or buyers for KDAF and KIAH. This was far too little and far too late to avoid an administrative hearing – much less secure approval of the Merger – as the Director and Officer Defendants well knew. In short, Sinclair's decision to revoke the proposed divestitures was an admission that the transactions were in violation of FCC rules.

94.     Sinclair's pursuit of related-party divestitures over the FCC's repeated warnings combined with Sinclair's disregard for the FCC's rules yielded the final impediment to the Merger's approval, robbing Sinclair stockholders of a highly accretive merger.

**B.      The FCC Issues Its Hearing Designation Order Exposing Serious Breaches of Fiduciary Duty**

95.     On July 19, 2018, the FCC released the Hearing Designation Order unanimously adopted by the commissioners.  The Order targeted Sinclair's Fader and Cunningham divestiture proposals, and it determined that:

> The record raises significant questions as to whether those proposed divestitures were in fact "***sham***" transactions . . . Such facts raise questions about whether Sinclair was the real party-in-interest under Commission rules and precedents and attempted to skirt the Commission's broadcast ownership rules.  Although these three applications were withdrawn today, material questions remain because the real party-in-interest issue in this case ***includes a potential element of misrepresentation and lack of candor that may suggest granting other, related applications by the same party would not be in the public interest***…

96.     The FCC detailed the terms of the proposed sales in Chicago, Houston, and Dallas to Fader and Cunningham that indicated Sinclair would continue to exercise *de facto* control over those stations.

97.     With respect to the sale of WGN in Chicago to Fader, the FCC stated as follows:

> The sale of WGN-TV to Fader involves many atypical deal terms, as well as several agreements that delegate operation of many aspects of the station to Sinclair.  In particular, WGN TV, LLC, would have entered into a JSA, SSA, Option, and lease-back of non-license assets necessary for operation of the station.  Sinclair would have sold advertising time, provided back office

services, and programmed a significant portion of the station's weekly broadcast hours. Furthermore, pursuant to the proposed transaction, WGN TV, LLC, would have purchased only the station license and certain other minimal assets, primarily a transmitter. Sinclair would have purchased the station's other assets.

In addition, Fader not only lacked any prior broadcasting experience, but also has extensive business relationships with David Smith, current director and controlling stockholder of Sinclair. This called into question Fader's independence from Sinclair. Specifically, we question the legitimacy of the proposed sale of … such a highly rated and profitable station in the nation's third-largest market to an individual with no broadcast experience, with close business ties to Smith, and with plans to own only the license and minimal station assets …

The $60 million sales price for WGN-TV appears to be far below market. For instance, the 2002 sale of WPWR-TV, Chicago, IL, to Fox Television Stations, Inc., was executed at $425,000,000 – over seven times the sales price for WGN-TV…

In light of the relationship between Sinclair and Fader, in addition to sale terms that are typically favorable to the buyer, substantial and material questions of fact have been raised as to whether Sinclair was the real party-in-interest to the application to assign the license for WGN-TV to WGN TV, LLC.

98.     With respect to Sinclair's proposed divestitures of stations in Dallas and Houston, the FCC noted that it had previously determined that Sinclair "had exercised *de facto* control over [Cunningham] in violation of [FCC rules]." Although that previous sale was not designated for a hearing because "there was not a substantial and material question of fact whether [Cunningham] would operate independently in the future," the FCC had "noted that it would give 'appropriate consideration' to any further evidence of control by Sinclair should it be provided in future proceedings."

99.     As explained by the FCC, it was time to consider whether Cunningham would or

could operate independently from Sinclair:

> The terms of the deal for the purchase of the Texas stations KDAF and KIAH
> present new questions regarding whether Sinclair was the undisclosed real
> party-in-interest to the KDAF and KIAH applications.  In particular, we
> question the close relationship between Sinclair and Cunningham, an existing
> loan guarantee between Sinclair and Cunningham, and the proposed purchase
> price …
>
> [U]ntil January 2018, the estate of Carolyn Smith, the mother of the controlling
> shareholders of Sinclair, owned the voting shares of Cunningham.  Even when
> the voting shares were acquired in 2018 by … Cunningham's former banker,
> the sales price for the shares – $400,000 – was far below market value, … and
> the non-voting shares continue to be held by trusts for the benefit of Carolyn
> Smith's grandchildren.  Each son (the Smith brothers) … holds options to buy
> the voting shares in the future, that [are] alleged [to be at] below market prices.
> The close relationship between Sinclair and Cunningham could explain how
> Cunningham was able to execute an agreement to purchase KDAF and KIAH
> at what appear to be below market prices …
>
> The Cunningham subsidiaries would have purchased the assets for both
> stations KDAF and KIAH for $60 million, subject to slight adjustment, while
> at the same time entering into an option and temporary Transition Services
> Agreement.  In addition to the existing relationship between Sinclair and
> Cunningham, there exists a $53.6 million intercompany guarantee listed in
> Sinclair's SEC Form 10Q.  The guarantee suggests a layer of financial
> entanglement heretofore unexamined.  Moreover, the combined executed sales
> price was far below the expected market price for stations in markets this size,
> suggesting that the transaction was not at arms-length.  KDAF and KIAH are
> located in the fifth and seventh largest markets in the nation, respectively, yet
> the combined sales price was below the $65 million price that was agreed to by
> Meredith Corporation for station KPLR-TV, St. Louis, Missouri, which is
> located in the 21st largest market …
>
> In light of the relationship between Sinclair and Cunningham, in addition to
> sales terms that are atypically favorable to the buyers, substantial and material

questions of fact exist as to whether Sinclair was the real party-in-interest to the applications to assign the licenses of then-prospective assignee of KDAF and KIAH (Cunningham).

100.    Because of the related-party entanglements between Sinclair, the Smith brothers, Fader, and Cunningham – which Sinclair purposely failed to disclose in either the merger application or the divestiture applications – the FCC's Order concluded that:

> [S]ubstantial and material questions of fact have been raised regarding whether Sinclair was the real party-in-interest to the WGN-TV, KDAF, and KIAH application and, if so, whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission…. We note that Sinclair … did not fully disclose facts such as the pre-existing business relationships between Fader, Smith, and Sinclair nor the full entanglements between Cunningham, Smith, and Sinclair.  As such there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts with the intent to consummate this transaction without fully complying with our broadcast ownership rules.

101.    The FCC then ordered a hearing to be held before an administrative law judge concerning: (i) whether "Sinclair was the real party-in-interest to the WGN-TV, KDAF, and KIAH applications and, if so, whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission"; (ii) whether "consummation of the overall transaction would violate" the FCC's National Cap Rule; (iii) whether grant of the Merger "would serve the public interest, convenience, and/or necessity"; and (iv) whether approval of the Merger should be granted or denied.

102.    The FCC's decision to designate the Sinclair-Tribune merger transaction to an administrative hearing resulted in what one FCC Commissioner termed, a "*de facto* merger death

sentence." The Director and Officer Defendants dedicated (and unlawful) pursuit of regulatory approval of a transaction structure in the best of interests of the Smith brothers, but in violation of FCC rules, had finally come to an end.

## V.    SINCLAIR LOSES A HIGHLY ACCRETIVE MERGER AND BECOMES EMBROILED IN LITIGATION

103.   On August 9, 2018, nearly 15 months after the announcement the Merger, Tribune gave Sinclair notice of its decision to terminate the Merger Agreement for Sinclair's failure to use its best efforts to obtain regulatory approval of the transaction. Sinclair spent tens of millions of dollars throughout the course of the merger transaction in performing due diligence on Tribune, negotiate the merger transaction, assess the fairness of the transaction through financial and legal advisors, defend against regulatory investigations, and seek regulatory approval of the transaction. As a direct result of the Director and Officer Defendants breaches of duty, Tribune's cancellation of the Merger Agreement has resulted in substantial harm to the Company.

104.   Tribune also filed a lawsuit in the Delaware Chancery Court against Sinclair for breach of contract seeking damages in excess of $1 billion. In the lawsuit, Tribune alleged that the Merger Agreement required Sinclair to use its reasonable efforts to obtain regulatory approval as promptly as possible, including an advance agreement to divest stations in certain markets as necessary or advisable for regulatory approval. However, to maintain control over

stations it was obligated to sell, Sinclair engaged in unnecessarily aggressive and protracted negotiations with the DOJ and FCC over regulatory requirements and proposed aggressive divestment structures and related-party sales – all in derogation of Sinclair's contractual obligations.   As alleged in the Tribune complaint, Sinclair's entire course of conduct was in blatant violation of the Merger Agreement and, but for Sinclair's actions and breach of the Merger Agreement, the transaction would have closed.

105.    At the time of the lawsuit, Tribune announced its second quarter results, shedding light on what Sinclair stockholders lost out on due to the Director and Officer Defendants' breaches of fiduciary duty.   According to Tribune's press release, the company had "very strong" results, with consolidated EBITDA growing 69% versus the prior year period and 84% for the first half of the year.   Moreover, Tribune's focus on cost management drove programming expenses down 29% and Corporate and Other cash expenses, excluding transaction costs, down 19% over the prior year end.   All of these results should have inured to the benefit of Sinclair and its stockholders.

106.    On the heels of the Tribune lawsuit, Sinclair stockholders filed a securities class action seeking damages for the Company's repeated and blatant false statements regarding the progress of the Sinclair-Tribune merger transaction.   Specifically, the plaintiff alleged that Sinclair made numerous false and misleading statements between May 2017 and August 2018 that created the false impression that Sinclair was abiding by the contractual provisions in the

Merger Agreement and pursuing divestitures in compliance with FCC rules.

107.    By way of example, the plaintiff alleges numerous statements made by Sinclair, which were known to be false by the Director and Officer Defendants, in which the Company reassured investors that the proposed divestitures to Cunningham and Fader were not sham transactions and that those entities were in fact independent.  However, the Director and Officer Defendants knew full well that such statements were false.

108.    Upon disclosure of the truth, the plaintiff alleges that Sinclair's stock price fell precipitously, resulting in hundreds of millions of dollars of liability.

## VI.    SINCLAIR'S LACK OF CANDOR WITH THE FCC PUTS THE COMPANY'S BROADCAST LICENSES AT RISK

109.    Although concrete and identifiable damages exist today, the failed Tribune acquisition could be just the beginning of Sinclair's problems.   Sinclair now faces a long list of unresolved issues the Company created for itself during the failed Tribune acquisition process.

110.    Under FCC rules, when a station seeks the grant or renewal of broadcast licenses, the FCC is required to examine an applicant's "citizenship, *character*, and financial, technical, and other qualifications" before granting or renewing a broadcast license.  Although the FCC does not define character, the policy behind the FCC's consideration of a licensee's character is to determine whether the applicant would "deal truthfully" with the Commission and has a "propensity to comply with the law generally."   In addition, the FCC's July 19, 2018 Hearing

Designation Order made clear that future applications by Sinclair could be rejected because they "would not be in the public interest."

111.    Sinclair's misconduct in connection with the Tribune acquisition may lead the FCC to call into question the Company's character, or whether such applications were in the public interest, which could lead to the FCC refusing to grant new licenses to Sinclair or renew Sinclair's licenses already owned.

### DAMAGES

112.    As alleged herein, the Director and Officer Defendants breached their duties of care, loyalty, and good faith by causing the Company: (i) to engage in sham transactions in circumvention of FCC rules and regulations, (ii) to make false and misleading statements to the FCC in furtherance of the sham transaction scheme, (iii) to breach the Merger Agreement by failing to take reasonable efforts to ensure government approval of the Sinclair-Tribune merger transaction, and (iv) to make false and misleading statements in the Company's public filings exposing Sinclair to substantial liability for securities violations.

113.    As a direct and proximate result of these breaches of fiduciary duty, Sinclair has suffered and will suffer billions of dollars in damages in the form of lost profits, direct damages, consequential damages, and exemplary damages, including but not limited to:

(a)    Lost profits from the highly accretive Tribune merger transaction;

(b)    Tens of millions of dollars in direct damages incurred in connection with the

failed Sinclair-Tribune merger transaction, including attorneys' fees, advisory
fees, and regulatory filing fees;

(c)    More than a billion dollars in potential liability in connection with the Tribune
litigation and the pending securities litigation; and

(d)    Damage to the Company's goodwill and reputation, including harming the
Company's ability to acquire additional broadcast licenses in the future or renew
broadcast licenses already owned.

## **DERIVATIVE ALLEGATIONS**

114.    Plaintiff brings this action derivatively in the right and for the benefit of Sinclair
to redress breaches of fiduciary duty and other violations of law committed by the Director and
Officer Defendants, as alleged herein.

115.    Plaintiff will adequately and fairly represent the interests of Sinclair and its
stockholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained
counsel experienced in prosecuting this type of action.  Plaintiff has continuously held Sinclair
common stock throughout all relevant times alleged herein and will continue to hold Sinclair
common stock continuously through resolution of this action.

116.    Plaintiff has not made pre-suit demand on the Board to assert the claims set forth
herein against the Director and Officer Defendants because such demand would have been futile,
and is thereby excused, since the allegations herein permit, at a minimum, the inference that the

Director Defendants lack the requisite independence and disinterest to determine fairly and objectively whether these claims should be pursued.

## DEMAND ALLEGATIONS

117.    As of the time immediately preceding the filing of this action, Defendants David Smith, Fredrick Smith, Duncan Smith, Robert Smith, Howard Friedman, Daniel Keith, Martin Leader, and Lawrence McCanna comprised the entire eight-member Board of Sinclair.

118.    As discussed in more detail below, a majority of the members of the Board would have been interested in (and, therefore, unable to fairly consider) a pre-suit demand to assert the claims alleged herein because (i) they were the beneficiaries of the related-party transactions (*i.e.*, the Smith brothers); (ii) they are either executives of the Company (i.e., Defendants David Smith, Duncan Smith, and Robert Smith) or have long-standing and material business relationships with the Smith brothers and the Smith family (*i.e.*, Defendants Keith, Leader, and McCanna); or (iii) they face a substantial likelihood of liability for their role in: (1) knowingly approving and/or receiving the benefit of related party divestitures in violation of FCC rules, (2) knowingly and intentionally failing to act in the face of repeated warnings from the FCC that the proposed divestitures were in violation of FCC rules, (3) knowingly and intentionally making false or misleading statements to the FCC regarding the business relationship between Sinclair and Cunningham or Fader in connection with seeking FCC approval of the Sinclair-Tribune merger transaction, (4) willfully breaching the Merger Agreement with Tribune, and (5)

knowingly and intentionally making false and misleading statements to Sinclair stockholders in the Company's public filings regarding the proposed divestitures and progress in seeking regulatory approval of the Sinclair-Tribune transaction (*i.e.*, the Director Defendants).

A.   **The Proposed Divestitures Would Have Benefitted Four of the Eight Directors (*i.e.*, the Smith Brothers) and the Remaining Directors Are Dominated and Controlled by the Smith Brothers, and Therefore Demand Is Futile**

119.   As alleged herein, the Smith brothers face a substantial likelihood of liability for pursing self-dealing conflicted transactions with Cunningham and Steven Fader in connection with the Sinclair-Tribune merger transaction.

120.   The Smith brothers are controlling stockholders of Sinclair, acting as a control group for purposes of voting on Company proposals or elections.  As controlling stockholders, the Smith brothers have absolute power to elect and terminate directors of the Company.

121.   Further, as controlling stockholders, the Company readily admits that "circumstances may occur in which the interests of the Smiths, as controlling security holders, could be in conflict with the interests of other security holders and the Smiths would have the ability to cause us [Sinclair] to take actions in their interest."  The Company further admits that "the Smiths could pursue acquisitions, divestitures, or other transactions that, in their judgment, could enhance ***their*** equity investment, ***even though*** such transactions might involve risks to our [Sinclair's] ***other security holders***."

46

122.     By the Company's own admission, the Smith brothers have absolute control over the Company's pursuit of certain transactions and divestitures, even if those transactions and divestitures would solely benefit the Smith brothers at the expense of Sinclair's minority stockholders.  This includes the Board's assessment of whether to pursue valid claims for breach of fiduciary duty against the Smith brothers.  For this reason, the Board is incapable of assessing a demand because the Smith brothers admittedly can control the outcome of any Board vote.

123.     Further, the Smith brothers are so personally conflicted and committed to the failed transactions at issue herein that they could not be expected to respond to a demand in good faith and within the ambit of the business judgement rule.  As alleged herein, the Smith brothers abused their control over the Company and the Board by causing Sinclair to propose and attempt to execute related-party divestitures of certain television broadcast stations in violation of FCC rules for the benefit of the Smith brothers, at the expense of minority stockholders.

124.     According to the Company's public filings, the Smith brothers have owned and continue to own an interest in Cunningham, and therefore Cunningham, as the Company admits, is a "related person."  Moreover, the Smith brothers have long-time business connections to Atlantic Automotive and Steven Fader.  Sinclair previously had an ownership stake in Atlantic Automotive, and David Smith is currently its controlling stockholder and a member of its board of directors.  Further, David Smith is a long-time business partner of Steven Fader.

125.     To skirt FCC rules, the Smith brothers attempted to execute a series of

divestitures to Cunningham and WGN-TV, LLC, operated by Steven Fader, for their own benefit, at the expense of minority stockholders.  The conflicted transactions at issue in this action personally implicate the Smith brothers in breaches of fiduciary duty for engaging in self-dealing transactions.  By proposing to divest certain television broadcast stations to Cunningham and WGN-TV, LLC for less than fair value, the Smith brothers abused their control over the Company and the Board for their own personal benefit, at the expense of the Company and its minority stockholders.

126.    Because the Smith brothers proposed divestitures that would have resulted in a benefit to themselves personally, they are so personally and directly conflicted by and committed to the failed transactions that they cannot assess a demand in good faith and within the ambit of the business judgment rule.

127.    While typically a stockholder must make a demand on the board of directors before suing in the name of the Company, here, demand is plainly futile.  The Smith brothers, whom the related party transactions were designed to personally benefit, constitute four of the eight members of the Board, and therefore a majority of the Board cannot impartially assess and vote to pursue the claims asserted herein.  Under traditional rules of board governance, an equally divided vote on a motion to sue has the same effect as a vote in which the motion is defeated by a one vote majority.  In either case, the motion is unsuccessful and does not become corporate policy.  For this reason, because a majority of the Board is not independent and

disinterested, the Board is so personally conflicted and committed to the failed transactions at issue herein that they could not be expected to respond to a demand in good faith and within the ambit of the business judgement rule.

128. While half the Board is conflicted by virtue of being the beneficiaries of the proposed related-party transactions, which is sufficient on its own to excuse demand, Defendants McCanna, Keith, and Leader also have disabling conflicts given their close, decades-long business and professional relationships with the Smith brothers and the Smith family, including:

(a) Mr. Keith, who is the President and Founder of the Cavanaugh Group, Inc., a Baltimore-based investment advisory firm founded in October 1995. In his role as investment advisor, Mr. Keith has provided investment and management services to three of the Smith brothers and certain corporations owned by one of more of them for at least 17 years.

(b) Mr. Leader is a retired partner of the law firm Shaw Pittman in Washington, D.C., where he specialized in communications law matters from 1999 to 2002. Mr. Leader was a senior partner with the law firm of Fisher Wayland Cooper Leader & Zaragoza in Washington, D.C. from 1973 to 1999. According to the Company's press release announcing Mr. Leader's appointment to the Board in 2002, from 1968 to 2002, Mr. Leader served as outside FCC counsel to Sinclair and its predecessor

companies.

(c)     Mr. McCanna was a shareholder of the accounting firm of Gross,
Mendelsohn & Associates, P.A. from 1972 and served as its managing
director through June 30, 2009.  Mr. McCanna has provided accounting,
tax, and related services to the Smith family and corporations owned by
them (other than Sinclair) for many years.

129.    Given the decades-long, substantial professional relationships between
Defendants Keith, Leader, and McCanna, on the one hand, and the Smith brothers and Smith
family, on the other, Defendants Keith, Leader, and McCanna are so personally and directly
conflicted that they could not be expected to respond to a demand in good faith and within the
ambit of the business judgement rule.

130.    For these reasons, demand is futile.

**B.      The Director and Officer Defendants Face A Substantial Likelihood of
Liability for Their Actions or Lack of Actions in Connection with the
Sinclair-Tribune Merger**

131.    The Director Defendants face a substantial likelihood of liability for acting in bad
faith by pursuing the interests of the Smith brothers at the expense of the minority stockholders
and failing to oversee the Company's compliance with contractual provisions and federal law.
For the following five reasons, demand is futile on the Board.

132.    *First*, as part of the merger transaction and approval process, the Director

Defendants likely approved the related party divestitures for the benefit of the Smith brothers. Because the Director Defendants acted for the benefit of the Smith brothers, at the expense of the Company and its minority stockholders, they have acted in bad faith, and therefore face a substantial likelihood of liability.

133. *Second*, the Director Defendants permitted the Company to engage in self-dealing, related party divestitures in violation of FCC rules. The Director Defendants received repeated warnings from regulators that the Cunningham and Steven Fader divestitures were in violation of FCC rules, but failed to take any corrective action to ensure approval of the Sinclair-Tribune merger transaction. The Director Defendants signed the Company's public filings, which described Cunningham and Atlantic Automotive as "related persons." The Director Defendants had knowledge of previous FCC enforcement actions in which the federal regulator found that the Company had exercised *de facto* control over Cunningham and found certain sidecar arrangements violative of FCC rules. Most importantly, the Director Defendants were specifically warned by FCC to amend the proposed divestitures to make sure that greater separation existed between Sinclair and the buyer. Rather than heed these warnings, the Director Defendants permitted Sinclair to divest two different stations to the same buyer – Cunningham – knowing full well that the FCC would not approve the divestiture.

134. *Third*, the Director Defendants caused the Company to submit materially false or misleading statements to the FCC in connection with the Sinclair-Tribune merger transaction.

The Director Defendants failed to include all facts known to the Smith brothers and the Company regarding Sinclair's – more specifically, the Smith brothers' – close business ties to Cunningham and Steven Fader.  Further, the Director Defendants failed to disclose the financial relationship between Sinclair and the Smith brothers and Cunningham and Steven Fader. Ultimately, the FCC found that the Company may have engaged in deception and materially misled the FCC by failing to disclose these facts, resulting in the FCC issuing the hearing designation order.

135.    **Fourth**, the Director Defendants consciously permitted the Company to breach the Merger Agreement by failing to use reasonable best efforts in seeking approval of the Sinclair-Tribune merger transaction.  As discussed herein, the Director Defendants permitted the Company to engage in sham divestitures and make materially false statements to the FCC.  As a result of these activities, Tribune brought suit in Delaware Chancery Court claiming that Sinclair breached the Merger Agreement and seeking $1 billion in damages.  The Company did not move to dismiss the Complaint, but rather immediately submitted an answer.  The litigation is currently in discovery.

136.    **Finally**, the Director Defendants caused the Company to make false and misleading statements to investors regarding the related party divestitures.  On numerous occasions, the Director Defendants failed to act to ensure that statements made by the Company's executives were truthful and accurate.  Instead, the Director Defendants permitted

the Company's executives to routinely misrepresent Sinclair's efforts to use reasonable best efforts to obtain approval of the Sinclair-Tribune merger transaction.

137.    For the same reasons discussed in this section, David Smith, Duncan Smith, and Robert Smith, as officers of the Company, face a substantial likelihood of liability for breaching their duty of care.   As officers, these defendants are not entitled to receive the benefit of exculpation, and therefore are liable to the Company for any action taken with gross negligence. Because Dr. Fredrick Smith is the brother of these defendants, he is incapable of independently assessing a demand to assert claims against his brothers in their capacities as officers.

138.    For these reasons, demand is also futile.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### (Against the Director Defendants)

139.    Plaintiff realleges each allegation above, as though fully set forth herein.

140.    The Director Defendants owed and owe fiduciary duties to Sinclair and its stockholders.   By reason of their fiduciary relationships, the Director Defendants specifically owed and continue to owe Plaintiff and Sinclair the highest obligation of due care, loyalty, and good faith in the administration of the Company's affairs, including, without limitation, the duty to honor contractual agreements with parties, comply with the law, and deal truthfully with regulators and stockholders.

141.     The Director Defendants consciously and willfully breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)     Consciously and willfully approving and pursuing related-party divestitures for the benefit of the Smith brothers, at the expense of minority stockholders, and in violation of FCC rules;

(b)     Consciously submitting untruthful applications for approval of the divestitures to the FCC;

(c)     Willfully failing to abide by the terms of the Company's contractual agreement with Tribune, including the willful failure to use best efforts to obtain regulatory approval of the merger transaction; and

(d)     Knowingly issuing false or misleading statements of material fact to Sinclair stockholders regarding the Company's efforts in complying with FCC requests for lawful divestitures.

142.     As a direct and proximate result of the foregoing breaches of fiduciary duty by the Director Defendants, Sinclair has sustained, and will continue to sustain, significant damages – both financially and to its corporate image and goodwill.  Such damages to Sinclair caused by the Director Defendants include, and will include, the substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny (including increased difficulty in receiving or renewing FCC broadcast licenses), and other liabilities described herein.

143.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**COUNT II**
**Breach of Fiduciary Duty**
**(Against the Officer Defendants)**

144.    Plaintiff realleges each allegation above, as though fully set forth herein.

145.    The Officer Defendants owed and owe fiduciary duties to Sinclair and its stockholders.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and continue to owe Plaintiff and Sinclair the highest obligation of due care, loyalty, and good faith in the administration of the Company's affairs, including, without limitation, the duty to honor contractual provisions with parties, comply with the law, and deal truthfully with regulators and stockholders.

146.    The Officer Defendants consciously and willfully breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)    Consciously and willfully approving and pursuing related-party divestitures for the benefit of the Smith brothers, at the expense of minority stockholders, and in violation of FCC rules;

(b)    Consciously submitting untruthful applications for approval of the divestitures to the FCC;

(c)    Willfully failing to abide by the terms of the Company's contractual agreement

55

with Tribune, including the willful failure to use best efforts to obtain regulatory approval of the merger transaction; and

(d)     Knowingly issuing false or misleading statements of material fact to Sinclair stockholders regarding the Company's efforts in complying with FCC requests for lawful divestitures.

147.    As a direct and proximate result of the foregoing breaches of fiduciary duty by the Officer Defendants, Sinclair has sustained, and will continue to sustain, significant damages – both financially and to its corporate image and goodwill.  Such damages to Sinclair caused by the Officer Defendants include, and will include, the substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny (including increased difficulty in receiving or renewing FCC broadcast licenses), and other liabilities described herein.

148.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

<u>**COUNT III**</u>
**Breach of Fiduciary Duty**
**(Against David Smith, Dr. Fredrick Smith, Duncan Smith, and Robert Smith**
**in Their Capacities as Controlling Stockholders)**

149.    Plaintiff realleges each allegation above, as though fully set forth herein.

150.    Defendants David Smith, Dr. Fredrick Smith, Duncan Smith, and Robert Smith are a coordinated group of investors with familial relationships who have agreed to vote their

shares together as a control group.  As such, the Smith brothers are the controlling stockholders of Sinclair and they owed and continue to owe Plaintiff and Sinclair the highest obligation of due care, loyalty, and good faith.

151.    By reason of the foregoing, Defendants David Smith, Dr. Fredrick Smith, Duncan Smith, and Robert Smith have breached their fiduciary duties by abusing their control over Sinclair in the following ways:

(a)    Proposing and pursuing related-party divestitures for their own benefit, at the expense of minority stockholders, and in violation of FCC rules;

(b)    Consciously submitting untruthful applications for approval of the divestitures to the FCC;

(c)    Willfully failing to abide by the terms of the Company's contractual agreement with Tribune, including the willful failure to use best efforts to obtain regulatory approval of the merger transaction; and

(d)    Knowingly issuing false or misleading statements of material fact to Sinclair stockholders regarding the Company's efforts in complying with FCC requests for lawful divestitures.

152.    Because of the misconduct alleged herein, Defendants David Smith, Dr. Fredrick Smith, Duncan Smith, and Robert Smith are liable to the Company for damages resulting directly and proximately from their breaches of fiduciary duties.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

a) Determining that this action is a proper derivative action maintainable under the law and demand was excused;

b) Finding that the Director and Officer Defendants breached their fiduciary duties to Sinclair in connection with the Sinclair-Tribune merger transaction and regulatory approval process;

c) Against all Defendants and in favor of the Company for the amount of any and all damages sustained by Sinclair as a result of Defendants' breaches of fiduciary duties, including any and all damages compensable by statute and/or law;

d) Against all Defendants and in favor of the Company for extraordinary equitable and injunctive relief as permitted by law and/or equity;

e) Directing Sinclair to take all necessary actions to reform and improve its compliance procedures and governance policies to comply with applicable laws and to protect Sinclair and its stockholders from a repeat of the damaging events described herein;

f) Awarding Sinclair restitution from all Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

g) Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants', consultants', and experts' fees, costs, and expenses; and

h)  Granting such other and further relief as this Court may deem just and proper.

Dated:  November 29, 2018

/s/ Cyril V. Smith
Cyril V. Smith (Federal Bar No. 07332)
ZUCKERMAN SPAEDER LLP
100 E. Pratt Street, Suite 2440
Baltimore, Maryland  21202
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Mark Lebovitch (*pro hac vice forthcoming*)
David MacIsaac
BERNSTEIN LITOWITZ
    BERGER & GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

*Counsel for Fire and Police Retiree Health
Care Fund, San Antonio*

# **<u>Exhibit 1</u>**

**VERIFICATION**

I, James Bounds, being duly sworn, declare as follows:

I am Executive Director of Fire and Police Retiree Health Care Fund, San Antonio (the "Fund") and am authorized to act on its behalf. The Fund is a shareholder of Sinclair Broadcast Group, Inc. ("Sinclair") and has continuously held share of Sinclair common stock since April 19, 2017, as stated in the foregoing Verified Stockholder Derivative Complaint ("Complaint"). The Fund has retained competent counsel and is ready, willing, and able to pursue this cation vigorously on behalf of Sinclair. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: November 13, 2018

James Bounds
Fire and Police Retiree Health Care Fund,
San Antonio