**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| FIRE AND POLICE RETIREE HEALTH CARE FUND, SAN ANTONIO, *et al.*<br><br>*Plaintiffs,*<br><br>v.<br><br>DAVID D. SMITH, *et al.*<br><br>*Defendants.* | Civil Action No. 1:18-cv-03670-CCB<br><br>(consolidated with Civil Action No. 1:18-cv-03952-CCB) |

## THE NON-SLC DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO THE VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Defendants David D. Smith, Frederick G. Smith, J. Duncan Smith, Robert E. Smith, Howard E. Friedman, Daniel C. Keith, and Christopher S. Ripley (collectively, the "Individual Defendants") and nominal Defendant Sinclair Broadcast Group, Inc. ("Sinclair" and, collectively with the Individual Defendants, the "Non-SLC Defendants"), by and through their undersigned counsel, for their Answer and Affirmative Defenses to the Verified Stockholder Derivative Complaint (the "Complaint") filed on November 29, 2018 by Fire and Police Retiree Health Care Fund, San Antonio in the above captioned Action (the "Action"), state as follows below.[1]

This Answer was prepared in good faith and based on the current, respective knowledge of the Non-SLC Defendants, who reserve their rights to revise and/or supplement this Answer. The Non-SLC Defendants further note that, as discussed with Plaintiffs' counsel, they believe

---

[1] Nominal Defendant Sinclair notes that the Complaint names Sinclair solely as a nominal defendant with respect to claims that Plaintiffs purport to assert derivatively against other Defendants on Sinclair's behalf and that no claims are asserted against Sinclair and no relief is sought from Sinclair. Accordingly, Sinclair joins in this Answer only to the extent that a response is required insofar as any allegations in the Complaint might be deemed applicable to Sinclair.

that it is premature to file an answer at this time, prior to the completion of the investigation of

the special litigation committee (the "SLC") of the Sinclair board of directors (the "Board"). The

SLC has been delegated the authority to investigate the matters, allegations, and claims raised in

the Complaint, as well as the authority to make decisions as to what actions (if any) are

appropriate and in the best interests of Sinclair and its shareholders in response to such matters,

allegations, and claims. The SLC has not yet completed its investigation and, for that additional

reason, this Answer remains subject to potential revision and/or supplementation.

## ANSWER[2]

## NATURE OF THE ACTION

**PARA. NO. 1:**   This is a simple and straight-forward derivative action that seeks to hold the Board – in particular, the Smith brothers – accountable for their actions in connection with the failed merger transaction between Sinclair and Tribune Media Company ("Tribune"). As alleged herein, the Director and Officer Defendants breached their duties of care, loyalty, and good faith by, among other things, (i) engaging in self-dealing transactions for the benefit of the Smith brothers (the Company's controlling stockholders) in violation of FCC rules, and (ii) knowingly misrepresenting and omitting material facts to the FCC in applications submitted to the federal government when seeking regulatory approval of the merger transaction. As a result of these breaches of duty, the Company has lost a highly accretive merger transaction, faces numerous lawsuits seeking over $1 billion in damages, and is exposed to concrete future harm relating to the renewal and acquisition of additional FCC licenses given its failure to deal candidly with the FCC.

**RESPONSE NO. 1:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 1, except they admit that the proposed merger between Tribune Media Company

("Tribune") and Sinclair (the "Merger") was not consummated and that Sinclair is a party to

several, publicly filed lawsuits relating to the Merger.

**PARA. NO. 2:**   Sinclair is a controlled company under NASDAQ rules. Since its inception, the Smith brothers – David Smith, Dr. Frederick Smith, J. Duncan Smith, and Robert

---

[2] Except as otherwise stated herein, the Non-SLC Defendants deny every allegation in the Complaint. In reproducing the allegations of the Complaint for purposes of this Answer, the Non-SLC Defendants have included Plaintiffs' section headings solely for the Court's convenience, but to the extent the section headings contain any allegations to which a response is required, the Non-SLC Defendants deny all such allegations. The Non-SLC Defendants further note that any defined terms used in their responses to the Complaint refer to terms specifically defined in the Non-SLC Defendants' responses and not any defined terms used in the allegations set forth in the Complaint.

Smith – have exercised complete control over the Company's business operations and corporate governance mechanisms. Given their absolute control, the Company admits in its public filings that the "the Smiths could pursue acquisitions, **divestitures**, or other transactions that, in their judgment, could enhance **their** equity investment, **even though** such transactions might involve risks to our [Sinclair's] **other security holders**." The Smith brothers' absolute control over the Company's divestitures for their own benefit, at the expense of minority stockholders, is the primary basis for this action.

**RESPONSE NO. 2:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 2, except they admit that (a) David D. Smith, Frederick G. Smith, J. Duncan Smith, and Robert E. Smith collectively hold shares representing over 50% of the common voting stock of Sinclair; (b) the Board has determined that Sinclair is a "controlled company" for purposes of the NASDAQ listing requirements; and (c) Plaintiffs selectively characterize and quote certain of Sinclair's public filings with the U.S. Securities and Exchange Commission (the "SEC"). The Non-SLC Defendants respectfully refer the Court to Sinclair's most recent Annual Reports filed with the SEC on Form 10-K on March 1, 2018 and March 1, 2019 (together with any amendments and exhibits thereto, "Sinclair's Annual Reports"), Sinclair's most recent Annual Proxy Statements filed with the SEC on Schedule 14A on April 26, 2018 and April 29, 2019 (together with any amendments and exhibits thereto, "Sinclair's Proxy Statements"), Sinclair's Amended and Restated Certificate of Incorporation (the "Charter"), and Sinclair's Amended By-Laws (the "By-Laws") for a complete and accurate statement of their contents and a description of Sinclair's business, Sinclair's capital and governance structure, and the stock ownership and voting power of Messrs. Smith.

**PARA. NO. 3:**   On May 8, 2017, Sinclair entered into an agreement and plan of merger with Tribune Media Company ("Tribune") for an aggregate purchase price of $3.9 billion (the "Merger Agreement"), plus the assumption of approximately $2.7 billion in net debt (the "Sinclair-Tribune Merger"). The transaction would give Sinclair ownership over 42 Tribune stations in key markets like New York and Chicago, adding to its existing footprint of more than 190 stations and giving the Company access to nearly three-quarters of U.S. households.

**RESPONSE NO. 3:**  The Non-SLC Defendants admit the allegations contained in the first sentence of Paragraph No. 3, except they aver that the allegations regarding the consideration to be paid in the Merger are subject to certain assumptions and are calculated as of the date of the announcement of the Merger (and not as of the date of the termination of the Agreement and Plan of Merger, dated May 8, 2017 between Sinclair and Tribune (the "Merger Agreement")).  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports for a complete and accurate description of Sinclair's business and to the Merger Agreement and the disclosure letter thereto (the "Disclosure Letter") for the terms and conditions of the Merger.  The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 3, and, to the extent that those allegations purport to characterize the Merger and Sinclair's business, they respectfully refer the Court to Sinclair's Annual Reports for a complete and accurate description of Sinclair's business and to the Merger Agreement and the Disclosure Letter for the terms and conditions of the Merger.

**PARA. NO. 4:**  As part of the Merger Agreement, Sinclair, with Board approval, agreed to use its reasonable best efforts to obtain regulatory approval of the transaction, including by divesting certain television broadcast stations to independent third-parties, as required by law. As expected, the FCC required Sinclair to divest certain stations to avoid triggering FCC limits on national ownership.

**RESPONSE NO. 4:**  The Non-SLC Defendants deny the allegations contained in the first sentence of Paragraph No. 4, which purport to characterize Sinclair's obligations under the Merger Agreement.  The Non-SLC Defendants respectfully refer the Court to the Merger Agreement and the Disclosure Letter for a complete and accurate statement of their contents and Sinclair's and Tribune's rights and obligations thereunder.  The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 4, except they admit that (a) the Merger Agreement and Disclosure Letter contemplated certain potential divestitures; (b) Sinclair engaged in discussions and negotiations with the Federal Communications Commission (the "FCC")

4

regarding the potential divestiture of certain television stations in connection with the FCC's review of the Merger; and (c) the FCC took the position that certain divestitures were necessary in order to obtain FCC consent for the Merger.

**PARA. NO. 5:**   Sinclair's efforts in seeking regulatory approval dragged on for more than a year, as Sinclair revised the deal several times, offering to sell off 21 stations in an effort to gain government approval. In those proposals, Sinclair devised at least two separate proposals to divest certain television broadcast stations to Cunningham Broadcasting Corporation ("Cunningham") and WGN-TV, LLC.

**RESPONSE NO. 5:**  The  Non-SLC  Defendants  deny  the  allegations  contained  in Paragraph No. 5, except they admit that Sinclair and Tribune considered and made several proposals concerning the potential divestiture of television stations in connection with the Merger, including the divestiture of certain television stations to Cunningham Broadcasting Corporation ("Cunningham") and WGN-TV, LLC.  The Non-SLC Defendants respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support thereto for a complete and accurate statement of their contents and the terms and conditions of the proposed divestitures.

**PARA. NO. 6:**   The Board knew that Cunningham and WGN-TV, LLC had extensive ties to Sinclair and were unlikely to be deemed sufficiently independent for purposes of FCC rules. By way of example, the Smith brothers held an ownership interest in Cunningham. Further, David Smith was the controlling stockholder of Atlantic Automotive, a company operated by Steven Fader who would also operate WGN-TV, LLC. The ties between Sinclair, on the one hand, and Cunningham and Steven Fader (through Atlantic Automotive), on the other hand, were so extensive that the Company's own public filings referred to Cunningham and Atlantic Automotive as "related persons."

**RESPONSE NO. 6:**  The  Non-SLC  Defendants  deny  the  allegations  contained  in Paragraph No. 6, except they admit that (a) the voting stock of Cunningham was owned by the estate of Carolyn C. Smith from the time of Mrs. Smith's death in 2012 until FCC approval of the sale of the voting stock to Cunningham's president, Michael Anderson, pursuant to applications that were filed with the FCC in 2013 and approved in December 2017, and that such sale to Mr.

Anderson was consummated in January 2018; (b) David D. Smith has a majority interest in Atlantic Automotive Corporation ("Atlantic Automotive"), a company co-owned by Steven Fader, and has certain other business relationships with Mr. Fader; and (c) Plaintiffs purport to characterize Sinclair's public filings with the SEC. The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, and Sinclair's other public filings with the SEC for a complete and accurate statement of their contents.

**PARA. NO. 7:**   Immediately after Sinclair's initial proposal to divest television broadcast stations to Cunningham and WGN-TV, LLC, news organizations criticized the proposed divestitures as "sham transactions." Importantly, the FCC specifically warned Sinclair that the proposed divestitures were inadequate under FCC rules because Sinclair (in particular the Smith brothers) maintained too close of a relationship to Cunningham and WGN-TV, LLC.

**RESPONSE NO. 7:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 7, except they admit that certain media publications criticized the Merger and the proposed divestitures and that Plaintiffs purport to characterize certain unidentified media reports.

**PARA. NO. 8:**   In the face of this specific warning, Sinclair submitted "new" proposed divestitures in an attempt to cure the FCC's concerns. However, the Board's new plan did nothing to change the most problematic aspects of the earlier divestitures. Specifically, Sinclair remained steadfast in its proposal to divest certain television broadcast stations to the same conflicted entities, Cunningham and WGN-TV, LLC. News reports once again immediately criticized Sinclair for failing to fix the problems previously identified by the FCC. Some critics again called the divestiture plan a "total sham." The Board did nothing in response.

**RESPONSE NO. 8:**   The Non-SLC Defendants deny the allegations contained in the first, second, third, and sixth sentences of Paragraph No. 8, except they admit that Sinclair filed applications with the FCC relating to the proposed divestitures of certain television stations to, among others, Cunningham and WGN-TV, LLC in connection with the FCC's review of the Merger.   The Non-SLC Defendants respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support thereto for a complete and accurate statement of their contents and the terms and conditions of the proposed divestitures.   The Non-SLC Defendants deny the allegations contained in the fourth and fifth sentences of Paragraph No.

8, except they admit that certain media publications criticized the Merger and the proposed

divestitures and that Plaintiffs purport to characterize certain unidentified media reports.

 **PARA. NO. 9:**  Thereafter, the FCC sought public comment on Sinclair's proposal. Those comments highlighted the fact that Sinclair had failed to disclose in its FCC applications certain material facts concerning the divestitures, including the full extent of the Smith brothers' business relationship with Steven Fader and Cunningham. In short, the public comments raised very serious concerns that the Director and Officer Defendants submitted false statements to a federal regulatory agency.

 **RESPONSE NO. 9:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 9, except they admit that, in response to the FCC's public comment period, certain

third parties filed objections noting, among other things, publicly available information concerning

relationships between Sinclair and Messrs. Smith and certain of the counterparties to the proposed

divestitures, including Cunningham and Mr. Fader.  The Non-SLC Defendants respectfully refer

the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support

thereto, as well as the publicly filed objections, for a complete and accurate statement of their

contents and the terms and conditions of the proposed divestitures.

 **PARA. NO. 10:**  The FCC agreed with the public comments. In advance of formal FCC action, Commissioner Ajit Pai issued a public statement expressing his concerns about Sinclair's proposed divestitures: "Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction." He went on to state, "[t]he evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."

 **RESPONSE NO. 10:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 10, except they admit that Plaintiffs characterize and selectively quote a press

release issued by FCC Chairman Ajit Pai on July 16, 2018 (the "July 16 FCC Release").  The Non-

SLC Defendants respectfully refer the Court to the July 16 FCC Release for a complete and

accurate statement of its contents.

 **PARA. NO. 11:**  On July 19, 2018, the FCC released a Hearing Designation Order, unanimously adopted by the Commissioners, that sent review of the Sinclair-Tribune Merger to

an administrative judge. According to news sources and the FCC, the decision to send the Sinclair-Tribune Merger for administrative review was a *de facto* death sentence for the merger transaction.

**RESPONSE NO. 11:** The Non-SLC Defendants admit the allegations contained in the first sentence of Paragraph No. 11, except they aver that FCC Commissioner Michael O'Reilly issued a statement attached to the Hearing Designation Order, issued by the FCC on July 19, 2018 (the "HDO"), expressing certain concerns regarding its issuance. The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 11, except they admit that Plaintiffs purport to characterize certain unidentified media reports and the statement of Mr. O'Reilly and they respectfully refer the Court to those documents for a complete and accurate statement of their contents.

**PARA. NO. 12:** In the hearing designation order, the FCC noted that the Sinclair-Tribune Merger would not serve the public interest, stating it took issue with the proposed divestiture plans offered by Sinclair. Based on the related-party entanglements between and among Sinclair, the Smith brothers, Steven Fader, and Cunningham – which Sinclair purposely failed to disclose in either the merger application or the divestiture applications – the FCC's Order concluded that:

> [S]ubstantial and material questions of fact have been raised regarding whether
>
> Sinclair was the real party-in-interest to the WGN-TV, KDAF, and KIAH application and, if so, ***whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission.... We note that Sinclair ... did not fully disclose facts such as the pre-existing business relationships between Fader, Smith, and Sinclair nor the full entanglements between Cunningham, Smith, and Sinclair.*** As such there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts with the intent to consummate this transaction without fully complying with our broadcast ownership rules.

**RESPONSE NO. 12:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 12, except they admit that Plaintiffs characterize and selectively quote the HDO (omitting substantial context). The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 13:**   The Director and Officer Defendants' insistence on fashioning related party transactions for the benefit of the Smith brothers, at the expense of minority stockholders, has resulted in substantial harm to the Company. On August 9, 2018, Tribune announced that it had terminated the Merger Agreement, depriving Sinclair stockholders of a highly accretive merger transaction.

**RESPONSE NO. 13:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 13, except they admit that, on August 9, 2018, Tribune terminated the Merger Agreement and issued a press release announcing said termination.  The Non-SLC Defendants respectfully refer the Court to that press release for a complete and accurate statement of its contents.

**PARA. NO. 14:**   Subsequently, Tribune filed suit in the Court of Chancery for the State of Delaware alleging that Sinclair breached the Merger Agreement by willfully failing to use reasonable best efforts to obtain regulatory approval, including by exhibiting a lack of candor with the FCC.

**RESPONSE NO. 14:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 14, except they that admit that, on August 9, 2018, Tribune filed a lawsuit (the "Tribune Complaint") against Sinclair in the Court of Chancery of the State of Delaware (the "Tribune Action") and that Plaintiffs purport to characterize the allegations in the Tribune Complaint.  The Non-SLC Defendants respectfully refer the Court to the Tribune Complaint and the other filings in the Tribune Action for a complete and accurate statement of their contents.

**PARA. NO. 15:**   Numerous stockholders have brought securities class actions in connection with the failed Sinclair-Tribune merger transaction. The complaints allege that Sinclair issued materially false and misleading statements regarding the proposed divestitures and the Company's progress in seeking regulatory approval of the transaction.

**RESPONSE NO. 15:** The Non-SLC Defendants admit the allegations contained in Paragraph No. 15, except aver that "numerous" is a characterization with which the Non-SLC Defendants do not agree.  The Non-SLC Defendants respectfully refer the Court to the filings in the consolidated class action captioned *In re Sinclair Broadcast Group, Inc. Securities Litigation*,

C.A. No. 1:18-CV-02445-CCB (the "Securities Litigation") for a complete and accurate statement of their contents.

**PARA. NO. 16:**   Although a stockholder typically must make a demand on the board of directors before suing in the name of the Company, here, demand is plainly futile. The Smith brothers, whom the related party transactions were designed to personally benefit, constitute four of the eight members of the Board, and therefore a majority of the Board cannot impartially assess and vote to pursue the claims asserted herein. Under traditional rules of board governance, an equally divided vote on a motion to sue has the same effect as a vote in which the motion is defeated by a one vote majority. In either case, the motion is unsuccessful and does not become corporate policy. For this reason, because a majority of the Board is not independent and disinterested, the Board is so personally conflicted and committed to the failed transactions at issue herein that they could not be expected to respond to a demand in good faith and within the ambit of the business judgement rule.

**RESPONSE NO. 16:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 16, except they admit that David D. Smith, Frederick G. Smith, J. Duncan Smith, and Robert E. Smith are brothers and members of the Board, and they aver that (a) Plaintiffs were required to make a pre-suit demand on the Board; (b) Plaintiffs did not make a pre-suit demand on the Board; and (c) the Board created the SLC to investigate, among other things, the matters, allegations, and claims raised in the Complaint.

**PARA. NO. 17:**   Moreover, the remaining directors are incapable of impartially assessing a demand because they are so personally and directly conflicted due to the Smith brothers' domination and control over the Board. As alleged herein, and based on public statements ***by the Company in its SEC filings***, the Smith brothers are the controlling stockholders of Sinclair with the power and authority to act to promote their own self-interests over the interests of the Company and its minority stockholders. The Board admits that the Smith brothers can take such action and, as alleged herein, did take such action, despite it representing a blatant breach of fiduciary duty. For this reason, the remaining directors are so committed to the transactions due to the Smith brothers' domination and control over Sinclair that they are incapable of assessing a demand in good faith.

**RESPONSE NO. 17:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 17, except they admit that David D. Smith, Frederick G. Smith, J. Duncan Smith, and Robert E. Smith collectively hold shares representing over 50% of the common voting stock of Sinclair and that Plaintiffs purport to characterize Sinclair's public filings with the SEC.  The

Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter, and the By-Laws for a complete and accurate description of Sinclair's capital and governance structure and the stock ownership and voting power of Messrs. Smith.

## JURISDICTION AND VENUE

**PARA. NO. 18:**   This Court has subject-matter jurisdiction over this action pursuant to 28 U.S. Code § 1332. Plaintiff is a retirement system created pursuant to statute of the State of Texas and provides services almost entirely to the City of San Antonio, Texas. Plaintiff has the capacity to sue and be sued in its own name. None of the Defendants is a citizen of Texas and the amount in controversy exceeds $75,000.

**RESPONSE NO. 18:**  The Non-SLC Defendants admit the allegations contained in the first sentence of Paragraph No. 18.  The Non-SLC Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph No. 18, except they admit that none of the Non-SLC Defendants are citizens of Texas.

**PARA. NO. 19:**   This Court has jurisdiction over each Defendant because Sinclair is incorporated and organized under the laws of Maryland and headquartered in Hunt Valley, Maryland and the Director and Officer Defendants are directors and officers of Sinclair, a Maryland company. Further, each defendant has minimum contacts with Maryland, as he has authorized acts that have had a sufficient impact on Sinclair and Sinclair's stockholders in Maryland to support this Court's personal jurisdiction over them.

**RESPONSE NO. 19:**  The allegations contained in Paragraph No. 19 are legal conclusions and characterizations of legal arguments and positions.  The Non-SLC Defendants admit that (a) Sinclair is incorporated and organized under the laws of Maryland; (b) Sinclair is headquartered in Hunt Valley, Maryland; and (c) the Individual Defendants (other than Mr. Ripley) are members of Sinclair's Board.

**PARA. NO. 20:**   This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

**RESPONSE NO. 20:**  The allegations contained in Paragraph No. 20 are legal conclusions and characterizations of legal arguments and positions.  The Non-SLC Defendants

lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 20.

**PARA. NO. 21:**   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**RESPONSE NO. 21:** The allegations contained in Paragraph No. 21 are legal conclusions and characterizations of legal arguments and positions.  The Non-SLC Defendants admit that venue is proper in this District.

## PARTIES

### Plaintiff

**PARA. NO. 22:   Plaintiff San Antonio** is a current holder of Sinclair common stock and has owned Sinclair common stock continuously since April 19, 2017.

**RESPONSE NO. 22:** The Non-SLC Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 22.

### Nominal Defendant

**PARA. NO. 23:   Nominal Defendant Sinclair** is a Maryland corporation with its principal place of business located in Hunt Valley, Maryland. Sinclair is a publicly traded telecommunications conglomerate that is controlled by the family of the Company's founder, Julian Sinclair Smith. The Company is the largest television station operator in the United States by number of stations, and largest by total coverage: owning and/or operating a total of 191 stations across the United States in over 100 markets (covering 40% of American households).

**RESPONSE NO. 23:** The Non-SLC Defendants admit the allegations contained in the first sentence of Paragraph No. 23.  The Non-SLC Defendants deny the remaining allegations contained in Paragraph No. 23, except they admit that Sinclair is a publicly traded, diversified television media company that, among other things, owns, provides programing and operating services pursuant to local marketing agreements ("LMAs"), or provides sales services and other non-programming operating services pursuant to other outsourcing agreements (such as joint sales agreements ("JSAs") and shared services agreements ("SSAs")) to approximately 191 broadcast

television stations in approximately 89 markets, and that Plaintiffs purport to characterize Sinclair's business and capital structure. The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter, and the By-Laws for a complete and accurate description of Sinclair's business, Sinclair's capital and governance structure, and the stock ownership and voting power of Messrs. Smith.

### **Director and Officer Defendants**

**PARA. NO. 24:   David D. Smith** was instrumental in the formation of Sinclair in 1986. He has served as Executive Chairman since January 2017 and Chairman of the Board since September 1990. David Smith also served as President and Chief Executive Officer from 1988 until January 2017. David Smith also serves as a member of the board of directors of Atlantic Automotive Corporation ("Atlantic Automotive"). David Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of Frederick, Duncan, and Robert Smith.

**RESPONSE NO. 24:** The Non-SLC Defendants admit the allegations contained in Paragraph No. 24.

**PARA. NO. 25:   Dr. Frederick G. Smith** has served as Vice President since 1990 and Director since 1986. Dr. Frederick Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Duncan, and Robert Smith.

**RESPONSE NO. 25:** The Non-SLC Defendants admit the allegations contained in Paragraph No. 25.

**PARA. NO. 26:   J. Duncan Smith** has served as Vice President, Secretary, and Director since 1986. Duncan Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Frederick, and Robert Smith.

**RESPONSE NO. 26:** The Non-SLC Defendants admit the allegations contained in Paragraph No. 26.

**PARA. NO. 27:   Robert E. Smith** has served as a Director since 1986. He served as Vice President and Treasurer of Sinclair from 1988 to June 1998, at which time he resigned from his position as Vice President and Treasurer. Robert Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Frederick, and Duncan Smith.

**RESPONSE NO. 27:** The Non-SLC Defendants admit the allegations contained in Paragraph No. 27.

**PARA. NO. 28:   Howard E. Friedman** has served as a Director since January 2015.

**RESPONSE NO. 28:** The Non-SLC Defendants admit the allegations contained in

Paragraph No. 28.

**PARA. NO. 29:   Daniel C. Keith** has served as a Director since May 2001.  Mr. Keith is
the President and Founder of the Cavanaugh Group, Inc., a Baltimore-based investment advisory
firm founded in October 1995. In his role as investment advisor, Mr. Keith has provided investment
and management services to three of the Smith brothers and certain corporations owned by one of
more of them.

**RESPONSE NO. 29:** The Non-SLC Defendants admit the allegations contained in

Paragraph No. 29.

**PARA. NO. 30:   Martin R. Leader** has served as a Director since May 2002. He also
served as a member of the board of directors of Atlantic Automotive until February 2006. Mr.
Leader is a retired partner of the law firm Shaw Pittman in Washington, D.C., where he specialized
in communications law matters from 1999 to 2002. Mr. Leader was a senior partner with the law
firm of Fisher Wayland Cooper Leader & Zaragoza in Washington, D.C. from 1973 to 1999.
According to the Company's press release announcing Mr. Leader's appointment to the Board in
2002, from 1968 to 2002, Mr. Leader served as outside FCC counsel to Sinclair and its predecessor
companies.

**RESPONSE NO. 30:** The Non-SLC Defendants admit the allegations contained in

Paragraph No. 30 and they respectfully refer the Court to Sinclair's 2002 press release for a

complete and accurate statement of its contents.

**PARA. NO. 31:   Lawrence E. McCanna** has served as a Director since July 1995. Mr.
McCanna was a shareholder of the accounting firm of Gross, Mendelsohn & Associates, P.A. from
1972 and served as its managing director through June 30, 2009. Mr. McCanna has provided
accounting, tax, and related services to the Smith family and corporations owned by them (other
than Sinclair).

**RESPONSE NO. 31:** The Non-SLC Defendants admit the allegations contained in the

first and second sentences of Paragraph No. 31.  The Non-SLC Defendants deny the allegations

contained in the third sentence of Paragraph No. 31, except they admit that Mr. McCanna, prior to

joining the Board, had conducted audits on two companies affiliated with Mr. Smith and that

another partner at Gross, Mendelsohn & Associates, P.A. has provided certain accounting services to entities affiliated with members of the Smith family.

**PARA. NO. 32:   Christopher S. Ripley** has served as President and Chief Executive Officer since January 2017. From April 2014 to January 2017, he served as Chief Financial Officer of the Company.

**RESPONSE NO. 32:** The Non-SLC Defendants admit the allegations contained in Paragraph No. 32.

**PARA. NO. 33:**   David D. Smith, Dr. Frederick G. Smith, J. Duncan Smith, and Robert E. Smith are collectively referred to herein as the "Smith brothers."

**RESPONSE NO. 33:** The Non-SLC Defendants apprehend that no response is required to the allegations contained in Paragraph No. 33, which contain a formatting convention.  To the extent that a response is required, the Non-SLC Defendants admit that Plaintiffs have defined the term "Smith brothers" as set forth in Paragraph No. 33.

**PARA. NO. 34:**   David D. Smith, Frederick G. Smith, J. Duncan Smith, Robert E. Smith, Howard E. Friedman, Daniel C. Keith, Martin R. Leader, and Lawrence E. McCanna are collectively referred to herein as the "Director Defendants" or the "Board."

**RESPONSE NO. 34:** The Non-SLC Defendants apprehend that no response is required to the allegations contained in Paragraph No. 34, which contain a formatting convention.  To the extent that a response is required, the Non-SLC Defendants admit that Plaintiffs have defined the terms "Director Defendants" and "Board" as set forth in Paragraph No. 34.

**PARA. NO. 35:**   David D. Smith, Frederick G. Smith, J. Duncan Smith, and Christopher S. Ripley, are collectively referred to herein as the "Officer Defendants."

**RESPONSE NO. 35:**   The Non-SC Defendants apprehend that no response is required to the allegations contained in Paragraph No. 35, which contain a formatting convention.  To the extent that a response is required, the Non-SLC Defendants admit that Plaintiffs have defined the term "Officer Defendants" as set forth in Paragraph No. 35.

## Relevant Non-Parties

**PARA. NO. 36:  Atlantic Automotive** is a holding company of MileOne Autogroup, a network of 40 auto dealerships in Maryland, Pennsylvania, Virginia, and North Carolina. Since at least 1997, Steven Fader has acted as CEO of Atlantic Automotive. Sinclair was previously a 17.5% owner of Atlantic Automotive, before selling its stake in 2005. Both David Smith and Martin Leader, current directors of Sinclair, served as directors of Atlantic Automotive while Sinclair had an ownership stake in the company. Steven Fader and David Smith remain close business partners.

**RESPONSE NO. 36:**  The Non-SLC Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 36, except they admit that (a) Atlantic Automotive is a holding company of MileOne Autogroup, which is a network of automobile dealerships; (b) Mr. Fader is the CEO of and a large investor in Atlantic Automotive; (c) Sinclair previously held a 17.5% ownership stake in Atlantic Automotive and sold that stake in approximately 2005; (d) David D. Smith and Mr. Leader have served as directors of Atlantic Automotive; (e) David D. Smith currently serves as a director of Atlantic Automotive; and (f) David D. Smith and Mr. Fader have certain business relationships.

**PARA. NO. 37:**   David Smith retained a controlling interest in Atlantic Automotive after Sinclair sold its stake in February 2006. He also continues to serve as a board member of Atlantic Automotive. Further, Atlantic Automotive is a Sinclair advertiser and tenant. Given these connections, Sinclair admits in its public filings that Atlantic Automotive is a "related person."

**RESPONSE NO. 37:**  The Non-SLC Defendants admit the allegations contained in the first and second sentences of Paragraph No. 37, except they aver that Sinclair sold its ownership stake in Atlantic Automotive in approximately 2005.   The Non-SLC Defendants deny the allegations in the third sentence of Paragraph No, 37, except they admit that Atlantic Automotive has advertised on Sinclair stations.   The Non-SLC Defendants deny the allegations contained in the fourth sentence of Paragraph No. 37, except they admit that Plaintiffs purport to characterize Sinclair's public filings with the SEC.   The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports for a complete and accurate statement of their contents.

**PARA. NO. 38: Cunningham Broadcasting Corporation** ("Cunningham") was formed in 1994 as Glencairn, Ltd., and was headed by Edwin Edwards, a former Sinclair executive. Cunningham is a television company that, together with its subsidiaries, owns and/or operates 20 television stations in eighteen markets across the United States. The initial capital investment to establish Cunningham was provided by Carolyn Cunningham Smith, wife of Sinclair founder Julian Smith and mother of David Smith, Dr. Frederick Smith, Duncan Smith, and Robert Smith. In 2001, the company changed its name to Cunningham Broadcasting Corporation, which was named after Carolyn Cunningham Smith.

**RESPONSE NO. 38:** The Non-SLC Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 38, except they admit that (a) Cunningham was initially formed as Glencairn; (b) Cunningham owns and/or operates certain television stations; (c) Carolyn C. Smith was the wife of Julian Smith and the mother of David D. Smith, Frederick G. Smith, J. Duncan Smith, and Robert E. Smith; (d) the voting stock of Cunningham was owned by the estate of Carolyn C. Smith from the time of Mrs. Smith's death in 2012 until FCC approval of the sale of the voting stock to Cunningham's president, Michael Anderson, pursuant to applications that were filed with the FCC in 2013 and approved in December 2017; (e) such sale to Mr. Anderson was consummated in January 2018; and (f) the company at some point changed its name from Glencairn to Cunningham.

**PARA. NO. 39:** The Smith family has held a controlling interest in Cunningham since its formation. In January 2018, the estate of Carolyn Smith sold the voting stock in Cunningham to Michael Anderson, a longtime banker for David Smith, for a below-market price of $400,000. The Smith brothers retain an option to repurchase their interest in Cunningham.

**RESPONSE NO. 39:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 39, except they admit that (a) voting stock of Cunningham was owned by the estate of Carolyn C. Smith from the time of Mrs. Smith's death in 2012 until FCC approval of the sale of the voting stock to Cunningham's president, Michael Anderson, pursuant to applications that were filed with the FCC in 2013 and approved in December 2017; (b) such sale to Mr. Anderson was consummated in January 2018; (c) the purchase price for the sale was set at or around $400,000 in accordance with an independent appraisal; (d) the non-voting stock of Cunningham

17

is owned by trusts for the benefit of the children of the Smith brothers; and (e) the Smith brothers hold an option to repurchase the voting stock subject to approval by the FCC.

**PARA. NO. 40:**   According to public sources, Cunningham was created by Sinclair in order to skirt FCC ownership rules. Cunningham has a history of buying divestitures from Sinclair accompanied by "sidecar agreements" (further defined below) that allow Sinclair to continue exercising control over the divested TV stations. Moreover, to fund the purchase of divestitures, Sinclair has provided Cunningham with access to substantial liquidity in the form of debt. As of 2018, Cunningham owed Sinclair approximately $53 million. Given the close connections between and among Sinclair, the Smith family, and Cunningham, the Company likewise admits in its public filings that Cunningham is a "related person."

**RESPONSE NO. 40:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 40, except they admit that (a) Sinclair has sold certain television stations to Cunningham; (b) certain of Sinclair's stations provide services to Cunningham's stations pursuant to LMAs or JSAs and SSAs; (c) Sinclair has guaranteed certain Cunningham debt; and (d) Plaintiffs purport to characterize Sinclair's public filings with the SEC.  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports for a complete and accurate statement of their contents and the relationship between Sinclair and Cunningham.

## SUBSTANTIVE ALLEGATIONS

I.   **BACKGROUND**

   A.   **Sinclair is Controlled by the Smith Family**

**PARA. NO. 41:**   Sinclair is one of the largest television broadcasting companies, with a broadcast distribution platform consisting of 191 stations in 89 markets, which Sinclair either owns outright; provides programming and operating services to, pursuant to agreements commonly referred to as local marketing agreements ("LMAs"); or provides sale services and other non-programming operating services to, pursuant to other outsourcing agreements (such as joint sales agreements ("JSAs") and shared services agreements ("SSAs")).

**RESPONSE NO. 41:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 41, except they admit that Sinclair is a publicly traded, diversified television media company that, among other things, owns, provides programing and operating services pursuant to LMAs, or provides sales services and other non-programming operating services pursuant to other

outsourcing agreements (such as JSAs and SSAs) to approximately 191 broadcast television

stations in approximately 89 markets, and that that Plaintiffs purport to characterize Sinclair's

business.  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports for

a complete and accurate description of Sinclair's business.

**PARA. NO. 42:**   Sinclair (formerly Chesapeake Television Corporation) was founded by
Julian Sinclair Smith in 1971. Julian Smith is the late father of David, Frederick, Duncan, and
Robert Smith. In or around 1986, Julian Smith's health started to decline, prompting all four Smith
brothers to join the family business. Robert acted as treasurer, Frederick as director and Duncan
as secretary and director. David Smith was tapped to become CEO in 1988 and became chairman
two years later, in 1990. In 1995, around the time it went public, the Company changed its name
to Sinclair Broadcasting.

**RESPONSE NO. 42:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 42, except they admit that (a) Sinclair was founded by Julian Smith in 1971; (b)

Julian Smith was the father of David D. Smith, Frederick E. Smith, J. Duncan Smith, and Robert

E. Smith; (c) the Smith brothers have held various roles at Sinclair over time (as described

elsewhere in this Answer); (d) David D. Smith became Sinclair's chief executive officer in 1988

(and served in that position until 2017) and executive chairman in 1991; and (e) the company

changed its name to Sinclair Broadcast Group.

**PARA. NO. 43:**   Since inception, the Smith family has had complete control over
Sinclair. News organizations have reported that David Smith and his three brothers – Frederick,
Duncan, and Robert – "maintain iron-clad control" over Sinclair through preferential voting
shares, majority presence on the Board, and long-term positions as executives of Sinclair.

**RESPONSE NO. 43:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 43, except they admit that Plaintiffs purport to characterize certain unidentified

media reports and Sinclair's business and capital structure.  The Non-SLC Defendants respectfully

refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter, and the By-

Laws for a complete and accurate statement of their contents and description of Sinclair's business,

Sinclair's capital and governance structure, and the stock ownership and voting power of Messrs. Smith.

**PARA. NO. 44:**   Sinclair has two classes of stock – Class A, which is entitled to one vote per share; and Class B, which is entitled to ten votes per share. The Smith brothers own all the Company's Class B stock and roughly 33% of the Company's Class A stock, providing them with over 74% of the vote. Thus, the Smith brothers have the right and power to control all matters brought to a stockholder vote, including the selection and election of all directors.

**RESPONSE NO. 44:**  The Non-SLC Defendants admit the allegations contained in the first and second sentences of Paragraph No. 44, except they aver that the Smith brothers own substantially all of Sinclair's Class B stock.  The Non-SLC Defendants deny the allegations contained in the third sentence of Paragraph No. 44.  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter, and the By-Laws for a complete and accurate statement of their contents and description of Sinclair's capital and governance structure and the stock ownership and voting power of Messrs. Smith.

**PARA. NO. 45:**   According to the Company's Proxy Statement, the Smith brothers have entered into a stockholders' agreement pursuant to which they have agreed to vote for each other as candidates for election to the Board until December 31, 2025. As a result, four of the Company's current eight directors are members of the Smith family. Given the presence of a majority of directors affiliated with the Smith family, the Board has determined that Sinclair is a controlled company for purposes of NASDAQ listing requirements, which means the Board need not have an independent majority.

**RESPONSE NO. 45:**  The Non-SLC Defendants admit the allegations contained in the first sentence of Paragraph No. 45.  The Non-SLC Directors deny the remaining allegations contained in Paragraph No. 45, except they admit that the Board has determined that Sinclair is a controlled company for purposes of NASDAQ listing requirements.  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter, and the By-Laws for a complete and accurate statement of their contents and description of Sinclair's capital and governance structure and the stock ownership and voting power of Messrs. Smith.

**PARA. NO. 46:**   Further, the Smith brothers have been the Company's executive officers and/or directors at all times since Sinclair became a public company in 1995. Currently, David Smith, Dr. Frederick Smith, and Duncan Smith are executive officers and directors and Robert Smith is a director. As executive officers, the Smith Brothers have absolute say over the Company's day-to-day operations.

**RESPONSE NO. 46:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 46, except they admit that Messrs. Smith have served in various executive positions

at Sinclair over time, that David D. Smith, Frederick G. Smith, and J. Duncan Smith currently are

executives of Sinclair, and that David D. Smith, Frederick G. Smith, J. Duncan Smith, and Robert

E. Smith currently are members of the Board.  The Non-SLC Defendants respectfully refer the

Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter, and the By-Laws for

a complete and accurate statement of their contents and description of Sinclair's capital and

governance structure and the stock ownership and voting power of Messrs. Smith.

**PARA. NO. 47:**   The Company also admits that the Smith brothers have the power to exert inordinate amounts of power over Sinclair, even if doing so would result in harm to minority stockholders. According to the Company's 2017 Form 10-K, filed on March 1, 2018, the Company admits that "circumstances may occur in which the interests of the Smiths, as controlling security holders, could be in conflict with the interests of other security holders and the Smiths would have the ability to cause [Sinclair] to take actions in their interest." Importantly, the Company further admits that "the Smiths could pursue acquisitions, divestitures, or other transactions that, in their judgment, could enhance ***their*** equity investment, ***even though*** such transactions might involve risks to [Sinclair's] ***other security holders***."

**RESPONSE NO. 47:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 47, except they admit that Plaintiffs characterize and selectively quote Sinclair's

Annual Report filed on Form 10-K filed with the SEC on March 1, 2018.  The Non-SLC

Defendants respectfully refer the Court to that filing for a complete and accurate statement of its

contents.

## B.     Sinclair's History of Expansion and Skirting FCC Rules

**PARA. NO. 48:**   Throughout his time as an executive of Sinclair, David Smith focused on expanding Sinclair's reach across the United States. While the Company had a small footprint in four cities in 1986, David Smith ultimately grew the Company's reach to nearly 40% of United

States households. As noted above, Sinclair has grown to be one of the largest television broadcast companies in the nation.

**RESPONSE NO. 48:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 48, except they admit that (a) Sinclair owned three television stations in 1986; (b) Sinclair has grown considerably in the subsequent decades; and (c) Sinclair is a publicly traded, diversified television media company that, among other things, owns, provides programing and operating services pursuant to LMAs, or provides sales services and other non-programming operating services pursuant to other outsourcing agreements (such as JSAs and SSAs) to approximately 191 broadcast television stations in approximately 89 markets.  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports and Sinclair's Proxy Statements for a complete and accurate statement of their contents and description of Sinclair's business.

**PARA. NO. 49:**  Sinclair's rapid expansion did not come without regulatory risks and penalties. Under antitrust laws and FCC ownership rules, television broadcast licensees are limited in the number of stations the company can own within specific demographic market areas ("DMAs") and throughout the nation. Although these rules have changed over time, the primary restrictions limit the number of television stations owned by any one company to curb monopoly power and ensure diversity in local programming.

**RESPONSE NO. 49:** The allegations contained in Paragraph No. 49 are legal conclusions and characterizations of legal arguments and positions.  The Non-SLC Defendants deny the allegations contained in Paragraph No. 49, except they admit that the broadcast industry is subject to regulation under the antitrust laws and the FCC.  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports for a complete and accurate statement of their contents and for a description of the regulations (and accompanying risks) to which Sinclair is subject.

**PARA. NO. 50:**  Since the Company began rapidly expanding in the late 1990s, the Company began to receive pushback from regulators. In many transactions, Sinclair's acquisitions would have resulted in the Company exceeding legal ownership thresholds. To avoid triggering

legal limits, regulators required Sinclair to divest certain stations in order to comply with antitrust laws and FCC rules.

**RESPONSE NO. 50:**   The  Non-SLC  Defendants  deny  the  allegations  contained  in

Paragraph No. 50, except they admit that, in connection with various transactions, Sinclair has

obtained regulatory approval and, in certain cases, has divested television stations in order to

obtain such approval.   The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual

Reports for a complete and accurate statement of their contents and for a description of the

regulations (and accompanying risks) to which Sinclair is subject.

**PARA. NO. 51:**   Rather  than  fully  divest  the  television  stations,  however,  Sinclair devised ways to keep control over the divested stations using legal loopholes known as sidecar arrangements. Sinclair would set up a shell company that would agree to buy the television broadcast license, and Sinclair would remain responsible for most of the television station's operations. Sidecar arrangements typically entail several agreements[3] whereby the senior partner in the agreement (*i.e.*, Sinclair) buys a television station's facilities and assets but sells the license to a junior partner (*i.e.*, an affiliated shell company). Under these sidecar agreements, Sinclair generally retained control over the finances, personnel, and programming of the station. According to Media Matters, pursuant to sidecar arrangements, Sinclair operated 48 stations in 23 states as of July 2018.

**RESPONSE NO. 51:**   The  Non-SLC  Defendants  deny  the  allegations  contained  in

Paragraph  No. 51  (including  Footnote  2  thereto),  except  they  admit  that  Sinclair,  in  certain

instances,  provides  programming  and  operating  services  pursuant  to  LMAs  or  provides  sales

services  and  other  non-programming  operating  services  pursuant  to  other  outsourcing  agreements

(such  as  JSAs  and  SSAs)  to  certain  television  stations  owned  by  non-Sinclair  FCC  licensees  and

that the fourth sentence of Paragraph No. 51 purports to characterize a July 20, 2018 *Media Matters*

article entitled "The FCC has called out several of Sinclair's sham deal proposals -- but there are

many more."   The Non-SLC Defendants respectfully refer the Court to the *Media Matters* article

---

[3] According to Sinclair's public filings, the Company has entered into agreements with other stations in certain markets, through which Sinclair provides programming and operating services pursuant to local marketing agreements (LMAs) or provide sales services or other non-programming operating services pursuant to outsourcing agreements, such as joint sales agreements (JSAs) and shared service agreements (SSAs).

for a complete and accurate statement of its contents and to Sinclair's Annual Reports and the 2019

Proxy for a complete and accurate statement of their contents and description of Sinclair's business

and the LMAs, JSAs, and SSAs to which Sinclair is party.

**PARA. NO. 52:**  The Director and Officer Defendants knew that regulators were skeptical of deals that leave one broadcaster entangled in a station's operations because Sinclair has faced regulatory fines for maintaining *de facto* control over certain sidecar entities. For instance, in 2001, Sullivan Broadcast Holdings, Inc. proposed to sell its television stations to Sinclair and Cunningham (then known as Glencairn). The FCC ruled that Sinclair entered into transactions with Cunningham that were not executed at arms-length, allowing Sinclair to exercise *de facto* control over Cunningham. *See In the Matter of Edwin L. Edwards and Carolyn Smith et. al*, (the "*2001 Glencairn Decision*"). As a result, Sinclair and Glencairn were required to pay $80,000 in fines to the FCC.

**RESPONSE NO. 52:**  The Non-SLC Defendants deny the allegations contained in

Paragraph No. 52, except they admit that Sinclair has, from time to time, paid regulatory fines or

entered into settlements with regulators and that Paragraph No. 52 purports to characterize the

FCC's ruling in *In the Matter of Edwin L. Edwards and Carolyn Smith et al.* (the "Glencairn

Decision").  The Non-SLC Defendants respectfully refer the Court to the Glencairn Decision for

a complete and accurate statement of its contents.

**PARA. NO. 53:**  In recent years, the Director and Officer Defendants have known that the FCC has taken an even harder line on sidecar arrangements, attributing sidecar stations to Sinclair under certain circumstances. For example, in 2014, under FCC Chairman Tom Wheeler, the Commission began to increase scrutiny regarding the use of sidecar arrangements to evade its policies. The FCC started to make JSAs count as ownership if the senior partner (e.g., Sinclair) sold 15% or more of the advertising for its junior partner (the shell company), and to ban coordinated retransmission consent[4] negotiations between two of the top four stations in the market. Chairman Wheeler also indicated that he planned to address local marketing and shared services agreements in the future. The Company's public filings, signed by the Board, disclosed the FCC's recent regulatory changes, and therefore the Board was aware of the FCC's increased scrutiny of sidecar arrangements.

---

[4] Retransmission consent is a provision of the 1992 United States Cable Television Consumer Protection and Competition Act that requires cable operators and other multichannel video programming distributors to obtain permission from broadcasters before carrying their programming. Generally, cable operators negotiate fees paid to broadcasters in order to receive consent to carry the broadcasters' programming.

**RESPONSE NO. 53:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 53, except they admit that the FCC's views on sharing agreements have changed over time and that the fifth sentence of Paragraph No. 53 purports to characterize Sinclair's public filings with the SEC. The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports and Sinclair's other public filings for a complete and accurate statement of their contents and Sinclair's public statements concerning regulatory changes. The Non-SLC Defendants deny the allegations contained in Footnote 3 in Paragraph No. 53, except they admit that the footnote purports to characterize the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1960 (1992). The Non-SLC Defendants respectfully refer the Court to that statute for a complete and accurate statement of its contents.

**PARA. NO. 54:**   The Director and Officer Defendants were also specifically aware of the FCC's renewed regulatory interest in examining sidecar arrangements. For example, in July 2016, the FCC announced that Sinclair would pay $9.485 million to resolve several investigations, including the FCC's investigation into whether Sinclair had illegally renegotiated retransmission consent agreements for third party companies that Sinclair allegedly did not control. The FCC's retransmission consent rules prohibit a broadcaster from negotiating jointly for one of its stations and for another station in the same market that it does not control. According to the FCC's investigation, Sinclair had negotiated retransmission consent on behalf of dozens of stations that it did not control while it was negotiating for its own stations in the same market.

**RESPONSE NO. 54:** The Non-SLC Defendants deny the allegations contained in the first, second, and fourth sentences of Paragraph No. 54, except they admit that they purport to characterize an FCC proceeding involving Sinclair, captioned *In the Matter of Sinclair Broadcast Group, Inc.*, DA-16-856. The Non-SLC Defendants respectfully refer the Court to the FCC docket for that matter for a complete and accurate statement of its contents. The allegations contained in the third sentence of Paragraph No. 54 are legal conclusions and characterizations of legal arguments and positions. The Non-SLC Defendants deny the allegations contained in the third sentence of Paragraph No. 54 and they respectfully refer the Court to the FCC retransmission consent rules for a complete and accurate statement of their contents.

**PARA. NO. 55:**   Thus, since at least 2001, the Director and Officer Defendants have known that Sinclair's use of questionable third-party entities and sidecar agreements resulted in numerous fines by the FCC, all of which put the Company's fiduciaries on notice of the importance of divesting stations to independent third-party companies (without strings attached) in order to comply with FCC rules in connection with merger transactions.

**RESPONSE NO. 55:**   The Non-SLC Defendants deny the allegations contained in

Paragraph No. 55.

## II.   THE MERGER TO CREATE THE LARGEST TELEVISION STATION OPERATOR IN THE UNITED STATES

### A.   Sinclair and Tribune Media Company Announce a Highly Accretive Merger Transaction

**PARA. NO. 56:**   On May 8, 2017, Sinclair entered into an agreement and plan of merger to acquire Tribune Media Company ("Tribune") for an aggregate purchase price of $3.9 billion (the "Merger Agreement"), plus the assumption of approximately $2.7 billion in net debt (the "Sinclair-Tribune Merger"). Under the terms of the Merger Agreement, Tribune stockholders would receive $35.00 plus 0.23 shares of Sinclair Class A stock (or approximately $43.50 per share).

**RESPONSE NO. 56:**   The Non-SLC Defendants admit the allegations contained in

Paragraph No. 56, except they aver that the allegations regarding the consideration to be paid in

the Merger are subject to certain assumptions and are calculated as of the date of the announcement

of the Merger (and not as of the date of the termination of the Merger Agreement).   The Non-SLC

Defendants respectfully refer the Court to the Merger Agreement and the Disclosure Letter for a

complete and accurate statement of the terms and conditions of the Merger.

**PARA. NO. 57:**   Sinclair's acquisition of Tribune was the largest acquisition in the Company's history. The acquisition of Tribune included 42 stations in 33 markets, WGN America and Prime Real Estate as well as equity stakes in TV Food Network and CareerBuilder. Combined, Sinclair and Tribune would have over $4.3 billion in revenue and cover 72% of the households in the United States across 108 markets, including 39 of the top 50 designated marketing areas ("DMAs") based on audience measurements complied by Nielsen Media Research.

**RESPONSE NO. 57:**   The Non-SLC Defendants deny the allegations contained in

Paragraph No. 57, except they admit that the Merger would have been Sinclair's largest

acquisition.   The Non-SLC Defendants respectfully refer the Court to the Merger Agreement and

the Disclosure Letter for a complete and accurate statement of the terms and conditions of the Merger.

**PARA. NO. 58:**  In the press release announcing the merger transaction, Chris Ripley, Sinclair's CEO, noted the benefits of the merger: "The Tribune stations are highly complementary to Sinclair's existing footprint and will create a leading nationwide media platform that includes our country's largest markets. The acquisition will enable Sinclair to build ATSC 3.0 (Next Generation Broadcast Platform) advanced services, scale emerging networks and national sales, and integrate content verticals. The acquisition will also create substantial synergistic value through operating efficiencies, revenue streams, programming strategies and digital platforms."

**RESPONSE NO. 58:**  The Non-SLC Defendants admit the allegations contained in Paragraph No. 58, except they aver that Plaintiffs have selectively quoted a press release issued by Sinclair on May 8, 2017.  The Non-SLC Defendants respectfully refer the Court to that press release for a complete and accurate statement of its contents.

**PARA. NO. 59:**  Thereafter, in an investor call and accompanying presentation, Sinclair touted the merger transaction as "highly accretive" to Sinclair stockholders. CEO Ripley projected that Tribune's core business would have "expected pro forma EBITDA of at least $650 million" and that "free cash flow per share will be over 40% accretive." Sinclair also informed stockholders that the Sinclair-Tribune merger would create a "substantial synergy opportunity," with some analysts estimating $250 to $270 million in total synergies. Overall, Sinclair stockholders stood to gain substantially from the acquisition of Tribune.

**RESPONSE NO. 59:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 59, except they admit that Sinclair believed that the Merger would have been beneficial to Sinclair and its stockholders and that Plaintiffs have characterized and selectively quoted from the transcript of a Sinclair investor call that took place on May 8, 2017.  The Non-SLC Defendants respectfully refer the Court to the transcript of Sinclair Broadcast Group Investor Announcement filed with the SEC on Form 425 on May 8, 2017 for a complete and accurate statement of its contents.

**B.  The Sinclair-Tribune Merger Raises Serious (But Manageable) Regulatory Issues**

**PARA. NO. 60:**  As noted above, Sinclair stood to significantly expand its national footprint by acquiring Tribune. Upon consummation of the merger transaction, Sinclair's

television broadcast company would reach 72% of United States households. Although this massive reach provided benefits to Sinclair and its stockholders, the percentage ownership (along with ownership of overlapping stations in certain DMAs) created issues for Sinclair in connection with receiving federal regulatory approval.

**RESPONSE NO. 60:** The Non-SLC Defendants deny the allegations contained in the

first and second sentences in Paragraph No. 60, except they admit that the Merger would have

substantially expanded Sinclair's reach and that the Merger required regulatory approval.  The

Non-SLC Defendants deny the allegations contained in the third sentence of Paragraph No. 60.

The Non-SLC Defendants respectfully refer the Court to the Merger Agreement and the Disclosure

Letter for a complete statement of the terms and conditions of the Merger and Sinclair's and

Tribune's respective rights and obligations thereunder.

**PARA. NO. 61:**  Two specific rules were implicated by the Sinclair-Tribune merger transaction – the Local TV Multiple Ownership Rule (the "Duopoly Rule") and the National TV Ownership Rule (the "National Cap Rule"). Under the Duopoly Rule, an entity is permitted to own up to two TV stations in the same DMA if either: (1) the service areas of the stations do not overlap, or (2) at least one of the stations is not ranked among the top four stations in the DMA (based on audience share), and at least eight independently owned TV stations would remain in the market after the proposed combination. Under the National Cap Rule, an entity is prohibited from owning a collective station group that exceeds 39 percent of all United States TV households.[5]

**RESPONSE NO. 61:** The allegations contained in Paragraph No. 61 (including Footnote

4 thereto) are legal conclusions and characterizations of legal arguments and positions.  The Non-

SLC Defendants deny the allegations contained in Paragraph No. 61 (and Footnote 4 thereto), and

they respectfully refer the Court to 47 C.F.R. § 73.3555(b) (the Duopoly Rule) and 47 C.F.R. §

73.3555(e) (the National Cap) for a complete and accurate statement of their contents.

**PARA. NO. 62:**  Thus, when a merger results in a company triggering either the Local TV Multiple Ownership Rule or the National TV Ownership Rule, the acquiring company must divest certain TV stations to ***independent third parties*** to avoid violating these FCC rules. The FCC will look to the actual substance of the divestiture to determine whether the transaction is

---

[5] For purposes of calculating the "national audience reach," TV stations on UHF channels (14 and above) count less than TV stations operating on VHF channels (13 and below). This is known as the UHF Discount.

arms'-length. Where a company's ties to the seller are too close, the FCC can declare that the seller has *de facto* control over the buyer and attribute the station to the seller.

**RESPONSE NO. 62:** The allegations contained in Paragraph No. 62 are legal conclusions and characterizations of legal arguments and positions. The Non-SLC Defendants deny the allegations contained in Paragraph No. 62 and they respectfully refer the Court to 47 C.F.R. § 73.3555(b) (the Duopoly Rule) and 47 C.F.R. § 73.3555(e) (the National Cap) for a complete and accurate statement of their contents.

**PARA. NO. 63:** Consistent with these FCC Rules, Sinclair agreed to divest certain stations to avoid triggering the National TV Ownership Rule. First, Sinclair agreed that WGN-TV Chicago, owned by Tribune, would be divested in the event requested by federal regulators. Second, Sinclair agreed to designate other station divestitures as necessary in order to comply with the National Cap Rule.

**RESPONSE NO. 63:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 63, except they admit that the Merger Agreement and the Disclosure Letter set forth certain rights and obligations with respect to divestitures and regulatory approvals. The Non-SLC Defendants respectfully refer the Court to the Merger Agreement and the Disclosure Letter for a complete and accurate statement of their contents and Sinclair's and Tribune's respective rights and obligations thereunder.

**PARA. NO. 64:** In addition to the specific divestitures outlined in the Merger Agreement, Sinclair agreed to take all actions necessary to receive regulatory approval of the merger transaction, provided those actions were compliant with federal law. For instance, pursuant to Section 7.1(a) of the Merger Agreement, Sinclair agreed to "use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable *under applicable Law* to consummate and make effective the Merger."

**RESPONSE NO. 64:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 64, which characterize and selectively quote the Merger Agreement. The Non-SLC Defendants respectfully refer the Court to the Merger Agreement and the Disclosure Letter for a complete and accurate statement of their contents and Sinclair's and Tribune's respective rights and obligations thereunder.

**PARA. NO. 65:**  Further, pursuant to Section 7.1(i), Sinclair agreed to "use reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable Closing to occur as soon as reasonably practicable," including efforts to avoid the entry of any permanent or temporary government order that would delay or prohibit the consummation of the transaction.

**RESPONSE NO. 65:**  The Non-SLC Defendants deny the allegations contained in

Paragraph No. 65, which characterize and selectively quote the Merger Agreement.  The Non-SLC

Defendants respectfully refer the Court to the Merger Agreement and the Disclosure Letter for a

complete and accurate statement of their contents and Sinclair's and Tribune's respective rights

and obligations thereunder.

## III.   SINCLAIR ONCE AGAIN ATTEMPTS TO SIDESTEP FCC RULES USING SHAM TRANSACTIONS

### A.   Sinclair's Proposed Divestiture Plan to the FCC

**PARA. NO. 66:**  On February 20, 2018, Sinclair filed a proposal with the FCC for station divestitures designed to avoid triggering FCC rules. Sinclair planned to divest, among other stations, (i) the WPIX New York station to Cunningham, and (ii) WGN-TV Chicago to WGN-TV, LLC, a newly formed entity operated by Steven Fader. However, the proposed "divestitures" were not divestitures at all but were instead insider deals with buyers connected to Sinclair and the Smith brothers personally.

**RESPONSE NO. 66:**  The Non-SLC Defendants deny the allegations contained in

Paragraph No. 66, except they admit that (a) Sinclair proposed selling certain assets of WGN-TV

to WGN-TV, LLC, an entity established by Mr. Fader; (b) on February 27, 2018, Sinclair filed an

application with the FCC proposing to divest WPIX-TV to Cunningham, which application was

withdrawn on April 24, 2018; and (c) on February 20, 2018, Sinclair filed applications with the

FCC to divest certain television stations to third parties.  The Non-SLC Defendants respectfully

refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support

thereto for a complete and accurate statement of their contents and the terms and conditions of the

proposed divestitures.

**PARA. NO. 67:**  For instance, Sinclair applied to divest WPIX-TV New York to Cunningham for $15 million. The WPIX divestiture raised serious concerns about the arms-length nature of the transaction. Sinclair was selling one of Tribune's most valuable assets to an insider for a mere $15 million, far below its market value.

**RESPONSE NO. 67:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 67, except they admit that on February 27, 2018, Sinclair filed an application with the FCC proposing to divest WPIX-TV to Cunningham, which application was withdrawn on April 24, 2018, and that the purchase price for that proposed divestiture of certain WPIX-TV assets was $15 million.  The Non-SLC Defendants respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support thereto for a complete and accurate statement of their contents and the terms and conditions of the proposed divestitures.

**PARA. NO. 68:**  Sinclair also applied to divest WGN-TV Chicago to WGN-TV, LLC for $60 million. WGN-TV LLC was a newly-formed entity established by Steven Fader, a car dealer with business ties to David Smith. Fader had no broadcast experience, which was precisely why Sinclair chose him to "purchase" WGN to allow for maximum control.

**RESPONSE NO. 68:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 66, except they admit that (a) Sinclair proposed selling certain assets of WGN-TV to WGN-TV, LLC, an entity established by Mr. Fader; (b) Mr. Fader is an owner in, among other businesses, Atlantic Automotive, an automotive business of which David D. Smith is a majority member; (c) the purchase price for the proposed divestiture of the WGN-TV assets was $60 million; and (d) Mr. Smith and Mr. Fader have certain business relationships.  The Non-SLC Defendants respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support thereto for a complete and accurate statement of their contents and the terms and conditions of the proposed divestitures.

**PARA. NO. 69:**  Sinclair's proposed operating agreements with Cunningham and Fader further suggested that Sinclair employees would have responsibility for the "divested" stations' operations, including advertising sales and retransmission consent negotiations; Sinclair would reap most of the economic benefits of the stations it was "divesting," including retransmission

revenues; and Sinclair would have an option to repurchase the stations in the future for little to no increase in price.

**RESPONSE NO. 69:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 69. The Non-SLC Defendants respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support thereto for a complete and accurate statement of their contents and the terms and conditions of the proposed divestitures.

**PARA. NO. 70:** Within a week of submitting the FCC applications, news outlets published numerous articles expressing concern about the self-dealing and related-party nature of Sinclair's proposed divestitures of WGN-TV and WPIX-TV.[6] According to *Variety*, "[t]he sale price of $15 million for a VHF station in the nation's largest TV market [New York] and $60 million for a VHF station in the No. 3 market [Chicago] was described as 'comical' by a broadcast TV veteran." The article noted that back in 2002, Fox paid $425 million to acquire WPWR-TV Chicago, a UHF station that was not nearly as strong in the market as WGN-TV.

**RESPONSE NO. 70:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 70 (including Footnote 5 thereto), except they admit that certain articles criticized the proposed divestitures and that Plaintiffs purport to characterize and selective quote from articles in *The Chicago Tribune*, *Fiercevideo*, *Variety*, and *The New York Business Journal*. The Non-SLC Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents.

**PARA. NO. 71:** Further, Craig Aaron, president of the Washington, D.C.-based Free Press told Variety, "[t]his is their [Sinclair's] most brazen flouting of existing FCC rules." He went on to state, "The only role these supposed owners have is to sign everything away to Sinclair including all profits. These sham deals are in place only long enough so that Sinclair can lobby hard enough to get rid of the (ownership) rules and buy the stations back."

**RESPONSE NO. 71:** The Non-SLC Defendants admit that the allegations contained in Paragraph No. 70 purport to characterize and selectively quote a March 3, 2018 *Variety* article

---

[6] *See, e.g.*, Robert Channick, CHICAGO TRIBUNE, *Sinclair deal to sell WGN to chairman's business partner gives broadcaster control* (Mar. 1, 2018); Ben Munson, FIERCEVIDEO, *Sinclair plans $60M sale of WGN-TV to chairman's business partner* (Mar. 2, 2018); Cynthia Littleton, VARIETY, *Sinclair's 'Brazen' Plan to Sell New York, Chicago Stations With Strings Attached Draws Criticism* (Mar. 3, 2018); Gina Hall, NEW YORK BUSINESS JOURNAL, *Sinclair takes next steps to sell WGN-TV Chicago and WPIX-TV New York* (Mar. 7, 2018).

entitled "Sinclair's 'Brazen' Plan to Sell New York, Chicago Stations With Strings Attached Draws Criticism." The Non-SLC Defendants respectfully refer the Court to that document for a complete and accurate statement of its contents.

**B.     The FCC Balks at Sinclair's Proposed Divestitures and Issues a Stern Warning**

**PARA. NO. 72:**   After the filing of the divestiture applications, the Director and Officer Defendants were made aware of the FCC's concerns relating to whether the WPIX-TV and WGN-TV divestitures were in fact made to independent third-parties.

**RESPONSE NO. 72:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 72, except they admit that Sinclair engaged in discussions with the FCC regarding the potential divestiture of certain television stations and filed applications regarding those potential divestitures with the FCC in connection with the FCC's review of the Merger.

**PARA. NO. 73:**   According to the *Wall Street Journal*, Sinclair was "encountering resistance from the [FCC]" given its close business ties to "the potential new owners of the spun-off stations."[7] The *WSJ* noted that "[b]oth purchasers have long ties to Sinclair and its executive chairman, David Smith." According to a person familiar with the matter, "[t]he FCC want[ed] safeguards in the sidecar contracts that would limit Sinclair's ability to influence the operations of the stations." Further, there was also "concern at the FCC that Sinclair [was] selling the stations for below market prices given that they are two of the most-valued assets of the Tribune portfolio."

**RESPONSE NO. 73:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 73 (including Footnote 6 thereto), except they admit that Plaintiffs purport to characterize and selectively quote an April 10, 2018 *Wall Street Journal* article entitled "Sinclair Faces Federal Resistance Over Proposed Purchase of Tribune Media." The Non-SLC Defendants respectfully refer the Court to that document for a complete and accurate statement of its contents.

**PARA. NO. 74:**   Sinclair's proposal was so provocative that the FCC staff refused even to put Sinclair's proposed sales of WPIX-TV to Cunningham, and WGN-TV to Fader, out for public comment. According to Tribune, at the time, "[i]n the staff's view, Sinclair's entanglements

---

[7] David Smith was aware of the *Wall Street Journal* reporting, as the article explicitly states that the reporter reached out to him seeking comment.

with the buyers and the terms of the operating agreements meant that the station sales could readily be viewed as 'sham' transactions."

**RESPONSE NO. 74:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 74, except they admit that (a) Sinclair engaged in discussions with the FCC regarding the potential divestitures of certain television stations in connection with the FCC's review of the Merger; (b) Sinclair made certain revisions to the proposed divestitures before the FCC put the divestiture plan out for public comment; and (c) Plaintiffs selectively quote the Tribune Complaint. The Non-SLC Defendants respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and filings in support thereto for a complete and accurate statement of their contents and the terms and conditions of the proposed divestitures and to the Tribune Complaint for a complete and accurate statement of its contents.

**PARA. NO. 75:** Thus, as of at least March or April 2018, the Director and Officer Defendants received a clear warning from the FCC to avoid related party transactions involving Cunningham and WGN-TV, LLC. Any director acting in good faith would have complied with the law to ensure that the Company's highly accretive merger would receive regulatory approval. In response, however, the Director and Officer Defendants did nothing to address the FCC's concerns. Rather, as discussed in the next section, Sinclair chose to "double-down" on its proposed divestitures to these same entities, despite general and specific warnings that such a strategy would doom the Sinclair-Tribune merger transaction.

**RESPONSE NO. 75:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 75.

## C.    Sinclair (Again) Fails to Heed the FCC's Warnings

**PARA. NO. 76:** On April 25, 2018, Sinclair filed an amended application with the FCC detailing the purported divestiture of six stations to comply with local and national FCC ownership rules. Sinclair proposed three divestitures (to two entities) that are of particular importance.

**RESPONSE NO. 76:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 76, except they admit that, from April 24, 2018 through May 14, 2018, Sinclair filed applications with the FCC to divest certain television stations to third parties in connection with the FCC's review of the Merger.

**PARA. NO. 77:** *First,* Sinclair opted to rescind the divestiture of WPIX-TV New York. In its place, Sinclair proposed the sale of two Texas television stations, KIAH in Houston and KDAF in Dallas, to Cunningham for approximately $60 million. Sinclair retained an option to repurchase both stations, and Sinclair had simultaneously entered into various service agreements, allowing the Company to effectively exercise control over these stations. However, Sinclair's disclosures to the FCC omitted key facts regarding the relationship between Sinclair and Cunningham.

**RESPONSE NO. 77:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 77, except they admit that (a) on April 24, 2018, Sinclair withdrew the application

to sell WPIX-TV to Cunningham; (b) Sinclair proposed to divest KIAH and KDAF to

Cunningham; (c) the purchase price for the proposed sale of KIAH and KDAF was a combined

$60 million; and (d) consistent with Sinclair's rights under the Merger Agreement and the

Disclosure Letter, the proposed sales of KDAF and KIAH were subject to a customary option to

repurchase the stations.  The Non-SLC Defendants respectfully refer the Court to Sinclair's and

Tribune's divestiture applications to the FCC and filings in support thereto for a complete and

accurate statement of their contents and the terms and conditions of the proposed divestitures.

**PARA. NO. 78:**   Cunningham agreed to purchase KDAF (Dallas) and KIAH (Houston) for substantially below what they were worth, even considering Sinclair's position of needing to divest the assets. Cunningham agreed to purchase the two stations for $60 million (by some accounts, ***more than $40 million***, or 40%, below market value). By comparison, Sinclair previously proposed to sell KPLR-TV in St. Louis to Meredith Corporation for $65 million. However, with respect to market size, KDAF was in the 5th largest DMA and KIAH was in the 7th largest DMA, while KPLR was in the 21st largest DMA. Thus, despite the far greater value of the stations, Cunningham was paying for them as if they were worth less than half of KPLR.

**RESPONSE NO. 78:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 78, except they admit that (a) the purchase price for the proposed sale of KDAF

and KIAH was a combined $60 million; (b) Sinclair proposed to divest KPLR-TV to Meredith

Corporation for a purchase price of $65 million in connection with the Merger; and (c) as of the

2019-20 Nielsen DMA Rankings, Dallas-Fort Worth (where KDAF is located) is the fifth largest

DMA, Houston (where KIAH is located) is the eighth largest DMA, and St. Louis (where KPLR-

TV is located) is the twenty-third largest DMA by market size in the United States.  The Non-SLC

Defendants respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the

FCC and filings in support thereto for a complete and accurate statement of their contents and the

terms and conditions of the proposed divestitures.

PARA. NO. 79:   *Second*, Sinclair proposed the sale of WGN-TV Chicago to WGN-TV, LLC for $60 million. Sinclair retained an option to repurchase the station, and Sinclair had simultaneously entered into various service agreements, allowing the Company to effectively exercise control over these stations. Again, these disclosures to the FCC were misleading and omitted material facts regarding the relationship between Sinclair and WGN-TV, LLC.

RESPONSE NO. 79:   The Non-SLC Defendants deny the allegations contained in

Paragraph No. 79, except they admit that purchase price for the proposed sale of certain (but not

all) of the assets of WGN-TV was $60 million, and that, consistent with Sinclair's rights under the

Merger Agreement and the Disclosure Letter, the proposed sale of the WGN-TV assets was subject

to a JSA, SSA, and a customary option to repurchase the station.  The Non-SLC Defendants

respectfully refer the Court to Sinclair's and Tribune's divestiture applications to the FCC and

filings in support thereto, the Merger Agreement, and the Disclosure Schedule for a complete and

accurate statement of their contents and the terms and conditions of the proposed divestitures.

PARA. NO. 80:   Sinclair's relation to WGN-TV, LLC, and continued control over the company, help explain why the Company was willing to sell WGN-TV for far below fair value. Sinclair agreed to sell WGN-TV for $60 million. However, news reports at the time noted that a "brand like WGN in the nation's third biggest media market" should have fetched a price close to $100 million or $150 million.

RESPONSE NO. 80:   The Non-SLC Defendants deny the allegations contained in the

first and second sentences of Paragraph No. 80, except they admit that purchase price for the

proposed sale of certain (but not all) of the assets of WGN-TV was $60 million.  The Non-SLC

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in the third sentence of Paragraph No. 80 concerning purported commentary

in unidentified news reports relating to the divestiture of WGN-TV.

**PARA. NO. 81:**   The planned divestitures, devised by the Smith brothers and approved by the Director Defendants, were related party transactions entered into for the benefit of the Smith brothers. As the Company readily admitted, "the Smiths could pursue acquisitions, divestitures, or other transactions that, in their judgment, could enhance ***their*** equity investment, ***even though*** such transactions might involve risks to our [Sinclair's] ***other security holders***." Although the Company disclosed the likelihood of breaches of fiduciary duty by the Smith brothers, such a disclosure does not absolve the Smith brothers (and the Director Defendants) of the unlawful act of preferring the Smith brothers' interests over those of the Company and its minority stockholders.

**RESPONSE NO. 81:**   The Non-SLC Defendants deny the allegations contained in the first and third sentences of Paragraph No. 81.   The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 81, except they admit that they characterize and selectively quote Sinclair's Annual Reports.   The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports for a complete and accurate statement of their contents.

**PARA. NO. 82:**   Further, the Smith brothers and Directors Keith and McCanna knew that the planned divestitures were related party transactions in violation of FCC rules because all six of those directors had served on the Board since at least November 2001, when the FCC issued its *2001 Glencairn Decision*. As noted above, Sinclair had already been found to exercise *de facto* control over Cunningham (at the time, Glencairn, Ltd.) and, as a result, been subject to fines by the FCC. The *2001 Glencairn Decision* notified the relevant Board members that the FCC would find *de facto* control to exist where, as here, the transaction is far below fair value and Sinclair remained in control through sidecar arrangements and assumption of Cunningham's debt.

**RESPONSE NO. 82:**   The Non-SLC Defendants deny the allegations contained in the first sentence of Paragraph No. 82, except they admit that David D. Smith, Frederick G. Smith, J. Duncan Smith, Robert E. Smith, Daniel C. Keith, and Lawrence E. McCanna have been members of Sinclair's Board since at least 2001.   The Non-SLC Defendants deny the allegations contained in the second and third sentences of Paragraph No. 82, which characterize the FCC's ruling in the Glencairn Decision.   The Non-SLC Defendants respectfully refer the Court to the Glencairn Decision for a complete and accurate statement of its contents.

**PARA. NO. 83:**   Moreover, the Director and Officer Defendants had knowledge that Cunningham and WGN-TV, LLC were considered, by the Company's own admission, "related persons." In each and every public filing leading up to the submission of Sinclair's divestiture applications, the Company publicly identified Cunningham and Atlantic Automotive, run by Steven Fader, as "related person[s]" due to extensive connections and ties with the Company's

controlling stockholders, the Smith brothers.[8] The Director Defendants had signed the Company's Form 10-Ks on February 28, 2017 and March 1, 2018 – both of which pre-dated submission of the FCC divestiture applications – that included a description of Cunningham's and Atlantic Automotive's entanglements with Sinclair.

**RESPONSE NO. 83:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 83 (including Footnote 7 thereto), except they admit that Plaintiffs purport to characterize and selectively quote Sinclair's Annual Reports filed with the SEC on Form 10-K on February 28, 2017 and March 1, 2018, and Quarterly Reports filed with the SEC on Form 10-Q on May 10, 2017, August 9, 2017, November 8, 2017, and May 10, 2018. The Non-SLC Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents.

**PARA. NO. 84:** The Director and Officer Defendants also had seen red flags notifying them that the proposed divestitures would not receive regulatory approval as recently as early April 2018, when the FCC had warned Sinclair that the Sinclair-Tribune merger transaction would not be approved ***unless Sinclair ensured appropriate distance and independence from the companies to which the divestitures would be made.***

**RESPONSE NO. 84:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 84.

**PARA. NO. 85:** News reports immediately criticized Sinclair for failing to fix the problems previously identified by the FCC earlier that month.[9] Some critics called the divestiture plan a "total sham." Other commentators drew the obvious comparison to the *2001 Glencairn Decision* in which the FCC shot down a set of sidecar deals between Sinclair and Cunningham, citing, in part, sales prices that were too low. Regulators had previously ruled that such low prices indicated that the deals were not legitimate, "arms-length" transactions.

**RESPONSE NO. 85:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 85 (including Footnote 8 thereto) and, to the extent that they purport to characterize

---

[8] Sinclair Form 10-Q, at 21-22 (filed on May 10, 2017) (same); Sinclair Form 10-Q, at 22-23 (filed on Aug. 9, 2017) (same); Sinclair Form 10-Q, at 24-25 (filed on Nov. 8, 2017) (same); Sinclair Form 10-K, at F39-40 (filed on Mar. 1, 2018) (same); Sinclair Form 10-Q, at 22-23 (filed on May 10, 2018) (same).

[9] CRAIN'S CHICAGO BUSINESS, *Sinclair agrees to sell WGN—but would still control it* (April 24, 2018); Ben Wofford, ROLLINGSTONE, *Sinclair Broadcasting's Hostile Takeover* (April 24, 2018); Jason Schwartz, POLITICO, *Armstrong Williams got 'sweetheart' deal from Sinclair* (June 13, 2018).

(a) an April 24, 2018 *Crain's Chicago Business* article entitled "Sinclair Agrees to Sell WGN—but would still control it"; (b) an April 24, 2018 *Rolling Stone* article entitled "Sinclair Broadcasting's Hostile Takeover"; and (c) a June 13, 2018 *Politico* article entitled "Armstrong Williams got 'Sweetheart' Deal from Sinclair," the Non-SLC Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents.  The Non-SLC Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 85 to the extent that they purport to characterize any unidentified commentary from purported critics or regulators relating to the Merger.

**PARA. NO. 86:**  Thereafter, on May 24, 2018, the American Cable Association filed a letter with the FCC complaining that Sinclair had failed to disclose necessary information to determine whether the Company retained *de facto* control over Cunningham and WGN-TV. As American Cable Association stated, "Sinclair withheld more than 250 agreements, schedules, exhibits, and related documents, including materials that appear to contemplate ongoing relationships between Sinclair and the parties to whom it will putatively divest stations." It was clear that Sinclair, at the behest of the Director and Officer Defendants, had determined to misrepresent and omit key facts from its FCC filings in order to facilitate approval of a merger transaction structure that violated FCC rules.

**RESPONSE NO. 86:**  The Non-SLC Defendants deny the allegations contained in the Paragraph No. 86, except they admit that the American Cable Association filed an objection with the FCC and that Plaintiffs purport to characterize and selectively quote that objection.  The Non-SLC Defendants respectfully refer the Court to that objection for a complete and accurate statement of its contents.

**PARA. NO. 87:**  In response to public criticism of the sham transactions, and without disclosing all facts to the FCC, Sinclair emphatically responded with more falsehoods, but this time to stockholders. In public statements, Sinclair reassured investors that "***Cunningham is operated completely separately from Sinclair . . . Sinclair will have no involvement in the operations of the Dallas and Houston stations being sold to Cunningham.***" Even more egregiously, Sinclair went further, stating "***Ownership rules are not being evaded; they are being complied with.***" The Director and Officer Defendants, however, knew that the true extent of the relationships between Sinclair, on the one hand, and Cunningham and Fader, on the other hand, had not been disclosed to the FCC and that the proposed divestitures constituted sham, related party transactions in violation of FCC rules.

**RESPONSE NO. 87:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 87, except they admit that the second and third sentences characterize and selectively quote certain Sinclair statements from various media publications and filings. The Non-SLC Defendants respectfully refer the Court to those articles and filings for a complete and accurate statement of Sinclair's statements to the media.

**PARA. NO. 88:** Therefore, despite repeated warnings, the Director and Officer Defendants continued to pursue a divestiture plan in bad faith and in violation of FCC rules. These fiduciaries decided to pursue a strategy in the interests of the Smith brothers, and at the expense of minority stockholders, with knowledge of the high risk that the FCC would block the merger transaction. During this time, the Director and Officer Defendants did nothing to ensure that Sinclair would: (i) pursue divestitures in compliance with FCC rules, (ii) submit truthful applications to the FCC, (iii) abide by the terms of its contractual agreement with Tribune to use best efforts to obtain regulatory approval, or (iv) issue truthful public disclosures regarding the Company's efforts to comply with FCC requests for lawful divestitures.

**RESPONSE NO. 88:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 88.

## IV.   SINCLAIR'S OMISSIONS AND MISREPRESENTATIONS RESULT IN A "*DE FACTO* MERGER DEATH SENTENCE"

### A.   Public Comment Leads the FCC to Inform Sinclair That the Merger Would Not Be Approved; Sinclair Scrambles and Admits Fault

**PARA. NO. 89:** On May 21, 2018, the FCC solicited public comment on the amended merger transaction and all of the proposed divestitures. The related-party "sales" to Fader (WGN-TV) and Cunningham (KIAH and KDAF) met broad and intense public opposition during the period for public comment, which lasted until July 12, 2018.

**RESPONSE NO. 89:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 89, except they admit that, on May 21, 2018, the FCC issued a public notice establishing a pleading cycle for the FCC applications filed in connection with the Merger, which public comment period concluded on July 12, 2018 and that certain third parties filed objections thereto.

**PARA. NO. 90:** Public comments on Sinclair's proposals brought to the FCC's attention the fact that Sinclair had failed to disclose in its applications to the Commission certain material

facts, including the full extent of the Smith brothers' business relationship with Fader, Sinclair's guarantee of Cunningham's debt, the sale in early 2018 of Cunningham's voting shares to Michael Anderson (a close Sinclair associate), and the suspiciously cheap option to buy those shares given to members of the Smith family.

**RESPONSE NO. 90:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 90, except they admit that, during the FCC's public comment period in connection with the Merger, certain third parties filed objections thereto. The Non-SLC Defendants respectfully refer the Court to the FCC docket and the objections filed thereon for a complete and accurate statement of their contents.

**PARA. NO. 91:** Following public comment on the proposed divestiture applications, on July 16, 2018, FCC Chairman Ajit Pai released a statement announcing the circulation to his fellow FCC commissioners of a draft order that would send review of the Merger to an administrative judge. Chairman Pai stated that:

> Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction. The evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow ***Sinclair to control those stations in practice, even if not in name, in violation of the law.***

**RESPONSE NO. 91:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 91, except they admit that, on July 16, 2018, Chairman Pai issued the July 16 FCC Release and that the allegations contained in Paragraph No. 91 purport to characterize and selectively quote the July 16 FCC Release. The Non-SLC Defendants respectfully refer the Court to the July 16 FCC Release for a complete and accurate statement of its contents.

**PARA. NO. 92:** Later that day, media outlets reported that Chairman Pai had circulated a draft hearing designation order to other Commissioners contending that Sinclair had provided inaccurate and incomplete information to the FCC in connection with the Fader and Cunningham divestiture applications and that a majority of the Commissioners had voted to refer the applications to an administrative law judge.

**RESPONSE NO. 92:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 92, except they admit that Plaintiffs have purported to characterize certain unidentified media reports and that it was publicly reported at that time that at least three of the

FCC Commissioners had already voted to refer the FCC applications to an administrative law judge for review.

**PARA. NO. 93:**   On July 18, 2018, in response to public statements of Chairman Pai and public reports of Chairman Pai's plans, Sinclair withdrew the divestiture applications for the three stations to be sold to Cunningham and Steven Fader. At the same time, Sinclair informed the Commission it would keep WGN for itself and work to find an independent buyer or buyers for KDAF and KIAH. This was far too little and far too late to avoid an administrative hearing – much less secure approval of the Merger – as the Director and Officer Defendants well knew. In short, Sinclair's decision to revoke the proposed divestitures was an admission that the transactions were in violation of FCC rules.

**RESPONSE NO. 93:**   The Non-SLC Defendants deny the allegations contained in Paragraph No. 93, except they admit that on July 18, 2018, Sinclair and Tribune submitted a letter to the FCC stating they had withdrawn their applications to divest WGN-TV, KIAH, and KDAF and filed an amendment to their FCC applications stating that Sinclair would itself acquire WGN-TV from Tribune as part of its acquisition of Tribune, and that Sinclair intended to file applications to assign KIAH and KDAF to a divestiture trust pending entering into agreements to sell such stations, and further that Sinclair issued a press release announcing the forgoing.  The Non-SLC Defendants respectfully refer the Court to Sinclair's and Tribune's filings with the FCC and to Sinclair's July 18, 2018 press release for a complete and accurate statement of their contents.

**PARA. NO. 94:**   Sinclair's pursuit of related-party divestitures over the FCC's repeated warnings combined with Sinclair's disregard for the FCC's rules yielded the final impediment to the Merger's approval, robbing Sinclair stockholders of a highly accretive merger.

**RESPONSE NO. 94:**   The Non-SLC Defendants deny the allegations contained in Paragraph No. 94.

**B.    The FCC Issues Its Hearing Designation Order Exposing Serious Breaches of Fiduciary Duty**

**PARA. NO. 95:**   On July 19, 2018, the FCC released the Hearing Designation Order unanimously adopted by the commissioners. The Order targeted Sinclair's Fader and Cunningham divestiture proposals, and it determined that:

> The record raises significant questions as to whether those proposed divestitures were in fact "***sham***" transactions . . . Such facts raise questions about whether Sinclair was the real party-in-interest under Commission rules and precedents and attempted to skirt the Commission's broadcast ownership rules. Although these three applications were withdrawn today, material questions remain because the real party-in-interest issue in this case ***includes a potential element of misrepresentation and lack of candor that may suggest granting other, related applications by the same party would not be in the public interest***...

**RESPONSE NO. 95:**  The Non-SLC Defendants admit the allegations contained in the first sentence of Paragraph No. 95.  The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 95, except they admit that they characterize and selectively quote the HDO.  The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 96:**   The FCC detailed the terms of the proposed sales in Chicago, Houston, and Dallas to Fader and Cunningham that indicated Sinclair would continue to exercise *de facto* control over those stations.

**RESPONSE NO. 96:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 96, which characterize the HDO.  The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 97:**   With respect to the sale of WGN in Chicago to Fader, the FCC stated as follows:

> The sale of WGN-TV to Fader involves many atypical deal terms, as well as several agreements that delegate operation of many aspects of the station to Sinclair. In particular, WGN TV, LLC, would have entered into a JSA, SSA, Option, and lease-back of non-license assets necessary for operation of the station. Sinclair would have sold advertising time, provided back office services, and programmed a significant portion of the station's weekly broadcast hours. Furthermore, pursuant to the proposed transaction, WGN TV, LLC, would have purchased only the station license and certain other minimal assets, primarily a transmitter. Sinclair would have purchased the station's other assets.

In addition, Fader not only lacked any prior broadcasting experience, but also has extensive business relationships with David Smith, current director and controlling stockholder of Sinclair. This called into question Fader's independence from Sinclair. Specifically, we question the legitimacy of the proposed sale of ... such a highly rated and profitable station in the nation's third-largest market to an individual with no broadcast experience, with close business ties to Smith, and with plans to own only the license and minimal station assets ...

The $60 million sales price for WGN-TV appears to be far below market. For instance, the 2002 sale of WPWR-TV, Chicago, IL, to Fox Television Stations, Inc., was executed at $425,000,000 – over seven times the sales price for WGN-TV...

In light of the relationship between Sinclair and Fader, in addition to sale terms that are typically favorable to the buyer, substantial and material questions of fact have been raised as to whether Sinclair was the real party-in-interest to the application to assign the license for WGN-TV to WGN TV, LLC.

**RESPONSE NO. 97:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 97, except they admit that they selectively quote the HDO.  The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 98:**  With respect to Sinclair's proposed divestitures of stations in Dallas and Houston, the FCC noted that it had previously determined that Sinclair "had exercised *de facto* control over [Cunningham] in violation of [FCC rules]." Although that previous sale was not designated for a hearing because "there was not a substantial and material question of fact whether [Cunningham] would operate independently in the future," the FCC had "noted that it would give 'appropriate consideration' to any further evidence of control by Sinclair should it be provided in future proceedings."

**RESPONSE NO. 98:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 98, which characterize and selectively quote the HDO.  The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 99:**  As explained by the FCC, it was time to consider whether Cunningham would or could operate independently from Sinclair:

The terms of the deal for the purchase of the Texas stations KDAF and KIAH present new questions regarding whether Sinclair was the undisclosed real party-in-interest to the KDAF and KIAH applications. In particular, we question the close relationship between Sinclair and Cunningham, an existing loan guarantee between Sinclair and Cunningham, and the proposed purchase price ...

[U]ntil January 2018, the estate of Carolyn Smith, the mother of the controlling shareholders of Sinclair, owned the voting shares of Cunningham. Even when the voting shares were acquired in 2018 by ... Cunningham's former banker, the sales price for the shares – $400,000 – was far below market value, ... and the non-voting shares continue to be held by trusts for the benefit of Carolyn Smith's grandchildren. Each son (the Smith brothers) ... holds options to buy the voting shares in the future, that [are] alleged [to be at] below market prices. The close relationship between Sinclair and Cunningham could explain how Cunningham was able to execute an agreement to purchase KDAF and KIAH at what appear to be below market prices ...

The Cunningham subsidiaries would have purchased the assets for both stations KDAF and KIAH for $60 million, subject to slight adjustment, while at the same time entering into an option and temporary Transition Services Agreement. In addition to the existing relationship between Sinclair and Cunningham, there exists a $53.6 million intercompany guarantee listed in Sinclair's SEC Form 10Q. The guarantee suggests a layer of financial entanglement heretofore unexamined. Moreover, the combined executed sales price was far below the expected market price for stations in markets this size, suggesting that the transaction was not at arms-length. KDAF and KIAH are located in the fifth and seventh largest markets in the nation, respectively, yet the combined sales price was below the $65 million price that was agreed to by Meredith Corporation for station KPLR-TV, St. Louis, Missouri, which is located in the 21st largest market ...

In light of the relationship between Sinclair and Cunningham, in addition to sales terms that are atypically favorable to the buyers, substantial and material questions of fact exist as to whether Sinclair was the real party-in-interest to the applications to assign the licenses of then-prospective assignee of KDAF and KIAH (Cunningham).

**RESPONSE NO. 99:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 99, which characterize and selectively quote the HDO. The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 100:** Because of the related-party entanglements between Sinclair, the Smith brothers, Fader, and Cunningham – which Sinclair purposely failed to disclose in either the merger application or the divestiture applications – the FCC's Order concluded that:

> [S]ubstantial and material questions of fact have been raised regarding whether Sinclair was the real party-in-interest to the WGN-TV, KDAF, and KIAH application and, if so, whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission.... We note that Sinclair ... did not fully disclose facts such as the pre-existing business relationships between Fader, Smith, and Sinclair nor the full entanglements between Cunningham, Smith, and Sinclair. As such there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts with the intent to consummate this transaction without fully complying with our broadcast ownership rules.

**RESPONSE NO. 100:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 100, which characterize and selectively quote the HDO. The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 101:** The FCC then ordered a hearing to be held before an administrative law judge concerning: (i) whether "Sinclair was the real party-in-interest to the WGN-TV, KDAF, and KIAH applications and, if so, whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission"; (ii) whether "consummation of the overall transaction would violate" the FCC's National Cap Rule; (iii) whether grant of the Merger "would serve the public interest, convenience, and/or necessity"; and (iv) whether approval of the Merger should be granted or denied.

**RESPONSE NO. 101:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 101, which characterize and selectively quote the HDO. The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 102:** The FCC's decision to designate the Sinclair-Tribune merger transaction to an administrative hearing resulted in what one FCC Commissioner termed, a "*de facto* merger death sentence." The Director and Officer Defendants dedicated (and unlawful)

pursuit of regulatory approval of a transaction structure in the best of interests of the Smith brothers, but in violation of FCC rules, had finally come to an end.

**RESPONSE NO. 102:** The Non-SLC Defendants deny the allegations contained in the first sentence of Paragraph No. 102, except they admit that Plaintiffs characterize and selectively quote the statement of FCC Commissioner O'Reilly. The Non-SLC Defendants respectfully refer the Court to the Statement of Commissioner O'Reilly for a complete and accurate statement of its contents. The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 102.

## V.    SINCLAIR LOSES A HIGHLY ACCRETIVE MERGER AND BECOMES EMBROILED IN LITIGATION

**PARA. NO. 103:** On August 9, 2018, nearly 15 months after the announcement the Merger, Tribune gave Sinclair notice of its decision to terminate the Merger Agreement for Sinclair's failure to use its best efforts to obtain regulatory approval of the transaction. Sinclair spent tens of millions of dollars throughout the course of the merger transaction in performing due diligence on Tribune, negotiate the merger transaction, assess the fairness of the transaction through financial and legal advisors, defend against regulatory investigations, and seek regulatory approval of the transaction. As a direct result of the Director and Officer Defendants breaches of duty, Tribune's cancellation of the Merger Agreement has resulted in substantial harm to the Company.

**RESPONSE NO. 103:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 103, except they admit that, on August 9, 2018, Tribune terminated the Merger Agreement and that Sinclair spent millions of dollars in connection with the Merger.

**PARA. NO. 104:** Tribune also filed a lawsuit in the Delaware Chancery Court against Sinclair for breach of contract seeking damages in excess of $1 billion. In the lawsuit, Tribune alleged that the Merger Agreement required Sinclair to use its reasonable efforts to obtain regulatory approval as promptly as possible, including an advance agreement to divest stations in certain markets as necessary or advisable for regulatory approval. However, to maintain control over stations it was obligated to sell, Sinclair engaged in unnecessarily aggressive and protracted negotiations with the DOJ and FCC over regulatory requirements and proposed aggressive divestment structures and related-party sales – all in derogation of Sinclair's contractual obligations. As alleged in the Tribune complaint, Sinclair's entire course of conduct was in blatant violation of the Merger Agreement and, but for Sinclair's actions and breach of the Merger Agreement, the transaction would have closed.

**RESPONSE NO. 104:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 104, except they admit that, on August 9, 2018, Tribune commenced the Tribune Action. The Non-SLC Defendants respectfully refer the Court to the Tribune Complaint and the other pleadings on the docket for a complete and accurate statement of their contents.

**PARA. NO. 105:** At the time of the lawsuit, Tribune announced its second quarter results, shedding light on what Sinclair stockholders lost out on due to the Director and Officer Defendants' breaches of fiduciary duty. According to Tribune's press release, the company had "very strong" results, with consolidated EBITDA growing 69% versus the prior year period and 84% for the first half of the year. Moreover, Tribune's focus on cost management drove programming expenses down 29% and Corporate and Other cash expenses, excluding transaction costs, down 19% over the prior year end. All of these results should have inured to the benefit of Sinclair and its stockholders.

**RESPONSE NO. 105:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 105, except they admit that, on August 9, 2018, Tribune announced, among other things, its second quarter results. The Non-SLC Defendants respectfully refer the Court to that earnings announcement for a complete and accurate statement of its contents.

**PARA. NO. 106:** On the heels of the Tribune lawsuit, Sinclair stockholders filed a securities class action seeking damages for the Company's repeated and blatant false statements regarding the progress of the Sinclair-Tribune merger transaction. Specifically, the plaintiff alleged that Sinclair made numerous false and misleading statements between May 2017 and August 2018 that created the false impression that Sinclair was abiding by the contractual provisions in the Merger Agreement and pursuing divestitures in compliance with FCC rules.

**RESPONSE NO. 106:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 106, except they admit that the Securities Litigation was filed after the Tribune Litigation was commenced. The Non-SLC Defendants respectfully refer the Court to the pleadings in the Securities Litigation for a complete and accurate statement of their contents.

**PARA. NO. 107:** By way of example, the plaintiff alleges numerous statements made by Sinclair, which were known to be false by the Director and Officer Defendants, in which the Company reassured investors that the proposed divestitures to Cunningham and Fader were not sham transactions and that those entities were in fact independent. However, the Director and Officer Defendants knew full well that such statements were false.

**RESPONSE NO. 107:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 107, except they admit that Plaintiffs purport to characterize the allegations in the pleadings in the Securities Litigation. The Non-SLC Defendants respectfully refer the Court to the pleadings in the Securities Litigation for a complete and accurate statement of their contents.

**PARA. NO. 108:** Upon disclosure of the truth, the plaintiff alleges that Sinclair's stock price fell precipitously, resulting in hundreds of millions of dollars of liability.

**RESPONSE NO. 108:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 108, except they admit that Plaintiffs purport to characterize the allegations in the pleadings in the Securities Litigation. The Non-SLC Defendants respectfully refer the Court to the pleadings in the Securities Litigation for a complete and accurate statement of their contents.

## VI.   SINCLAIR'S LACK OF CANDOR WITH THE FCC PUTS THE COMPANY'S BROADCAST LICENSES AT RISK

**PARA. NO. 109:** Although concrete and identifiable damages exist today, the failed Tribune acquisition could be just the beginning of Sinclair's problems. Sinclair now faces a long list of unresolved issues the Company created for itself during the failed Tribune acquisition process.

**RESPONSE NO. 109:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 109, except they admit that there is certain outstanding litigation relating to the Merger, including this Action. The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports for a summary of that litigation and the risks relating thereto.

**PARA. NO. 110:** Under FCC rules, when a station seeks the grant or renewal of broadcast licenses, the FCC is required to examine an applicant's "citizenship, *character*, and financial, technical, and other qualifications" before granting or renewing a broadcast license. Although the FCC does not define character, the policy behind the FCC's consideration of a licensee's character is to determine whether the applicant would "deal truthfully" with the Commission and has a "propensity to comply with the law generally." In addition, the FCC's July 19, 2018 Hearing Designation Order made clear that future applications by Sinclair could be rejected because they "would not be in the public interest."

**RESPONSE NO. 110:** The allegations contained in the first and second sentences of Paragraph No. 110 are legal conclusions and characterizations of legal arguments and positions.

The Non-SLC Defendants deny the allegations contained in the first and second sentences of Paragraph No. 110 and they respectfully refer the Court to the FCC's licensing rules for a complete and accurate statement of their contents.  The Non-SLC Defendants deny the allegations contained in the third sentence of Paragraph No. 110, except they admit that Plaintiffs purport to characterize and selectively quote the HDO.  The Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 111:**   Sinclair's misconduct in connection with the Tribune acquisition may lead the FCC to call into question the Company's character, or whether such applications were in the public interest, which could lead to the FCC refusing to grant new licenses to Sinclair or renew Sinclair's licenses already owned.

**RESPONSE NO. 111:** The allegations contained in Paragraph No. 111 are legal conclusions and characterizations of legal arguments and positions.  The Non-SLC Defendants deny the allegations contained in Paragraph No. 111 and they respectfully refer the Court to Sinclair's Annual Reports for a summary of the HDO and the risks relating thereto.

## DAMAGES

**PARA. NO. 112:**   As alleged herein, the Director and Officer Defendants breached their duties of care, loyalty, and good faith by causing the Company: (i) to engage in sham transactions in circumvention of FCC rules and regulations, (ii) to make false and misleading statements to the FCC in furtherance of the sham transaction scheme, (iii) to breach the Merger Agreement by failing to take reasonable efforts to ensure government approval of the Sinclair-Tribune merger transaction, and (iv) to make false and misleading statements in the Company's public filings exposing Sinclair to substantial liability for securities violations.

**RESPONSE NO. 112:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 112.

**PARA. NO. 113:**   As a direct and proximate result of these breaches of fiduciary duty, Sinclair has suffered and will suffer billions of dollars in damages in the form of lost profits, direct damages, consequential damages, and exemplary damages, including but not limited to:

(a)      Lost profits from the highly accretive Tribune merger transaction;

(b)     Tens of millions of dollars in direct damages incurred in connection with the failed Sinclair-Tribune merger transaction, including attorneys' fees, advisory fees, and regulatory filing fees;

(c)     More than a billion dollars in potential liability in connection with the Tribune litigation and the pending securities litigation; and

(d)     Damage to the Company's goodwill and reputation, including harming the Company's ability to acquire additional broadcast licenses in the future or renew broadcast licenses already owned.

**RESPONSE NO. 113:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 113.

## DERIVATIVE ALLEGATIONS

**PARA. NO. 114:**   Plaintiff brings this action derivatively in the right and for the benefit of Sinclair to redress breaches of fiduciary duty and other violations of law committed by the Director and Officer Defendants, as alleged herein.

**RESPONSE NO. 114:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 114, except they admit that Plaintiffs purport to bring this action derivatively.

**PARA. NO. 115:**   Plaintiff will adequately and fairly represent the interests of Sinclair and its stockholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting this type of action. Plaintiff has continuously held Sinclair common stock throughout all relevant times alleged herein and will continue to hold Sinclair common stock continuously through resolution of this action.

**RESPONSE NO. 115:** The allegations contained in the first sentence of Paragraph No. 115 are legal conclusions and characterizations of legal arguments and positions.  The Non-SLC Defendants deny the allegations contained in the first sentence of Paragraph No. 115, as Plaintiffs have not made a pre-suit demand on the Board and have chosen to disregard the SLC.  The Non-SLC Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph No. 115.

**PARA. NO. 116:**   Plaintiff has not made pre-suit demand on the Board to assert the claims set forth herein against the Director and Officer Defendants because such demand would have been futile, and is thereby excused, since the allegations herein permit, at a minimum, the inference

that the Director Defendants lack the requisite independence and disinterest to determine fairly and objectively whether these claims should be pursued.

**RESPONSE NO. 116:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 116, except they admit that Plaintiffs have not made a pre-suit demand on the Board.

## DEMAND ALLEGATIONS

**PARA. NO. 117:** As of the time immediately preceding the filing of this action, Defendants David Smith, Frederick Smith, Duncan Smith, Robert Smith, Howard Friedman, Daniel Keith, Martin Leader, and Lawrence McCanna comprised the entire eight-member Board of Sinclair.

**RESPONSE NO. 117:** The Non-SLC Defendants admit the allegations contained in Paragraph No. 117, except aver that Benson E. Legg also currently is a member of Sinclair's Board.

**PARA. NO. 118:** As discussed in more detail below, a majority of the members of the Board would have been interested in (and, therefore, unable to fairly consider) a pre-suit demand to assert the claims alleged herein because (i) they were the beneficiaries of the related-party transactions (*i.e.*, the Smith brothers); (ii) they are either executives of the Company (i.e., Defendants David Smith, Duncan Smith, and Robert Smith) or have long-standing and material business relationships with the Smith brothers and the Smith family (*i.e.*, Defendants Keith, Leader, and McCanna); or (iii) they face a substantial likelihood of liability for their role in: (1) knowingly approving and/or receiving the benefit of related party divestitures in violation of FCC rules, (2) knowingly and intentionally failing to act in the face of repeated warnings from the FCC that the proposed divestitures were in violation of FCC rules, (3) knowingly and intentionally making false or misleading statements to the FCC regarding the business relationship between Sinclair and Cunningham or Fader in connection with seeking FCC approval of the Sinclair-Tribune merger transaction, (4) willfully breaching the Merger Agreement with Tribune, and (5) knowingly and intentionally making false and misleading statements to Sinclair stockholders in the Company's public filings regarding the proposed divestitures and progress in seeking regulatory approval of the Sinclair-Tribune transaction (*i.e.*, the Director Defendants).

**RESPONSE NO. 118:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 118.

A.     **The Proposed Divestitures Would Have Benefitted Four of the Eight Directors (*i.e.*, the Smith Brothers) and the Remaining Directors Are Dominated and Controlled by the Smith Brothers, and Therefore Demand Is Futile**

**PARA. NO. 119:** As alleged herein, the Smith brothers face a substantial likelihood of liability for pursing self-dealing conflicted transactions with Cunningham and Steven Fader in connection with the Sinclair-Tribune merger transaction.

**RESPONSE NO. 119:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 119.

**PARA. NO. 120:**   The Smith brothers are controlling stockholders of Sinclair, acting as a control group for purposes of voting on Company proposals or elections. As controlling stockholders, the Smith brothers have absolute power to elect and terminate directors of the Company.

**RESPONSE NO. 120:** The Non-SLC Defendants deny the allegations contained in the first sentence of Paragraph No. 120 and they respectfully refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter and the By-Laws for a complete and accurate description of Sinclair's capital and governance structure and the stock ownership and voting power of Messrs. Smith.  The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 120, except they admit that David D. Smith, Frederick G. Smith, J. Duncan Smith, and Robert E. Smith collectively hold shares representing over 50% of the common voting stock of Sinclair.  The Non-SLC Defendants respectfully refer the Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter and the By-Laws for a complete and accurate description of Sinclair's capital and governance structure and the stock ownership and voting power of Messrs. Smith.

**PARA. NO. 121:**   Further, as controlling stockholders, the Company readily admits that "circumstances may occur in which the interests of the Smiths, as controlling security holders, could be in conflict with the interests of other security holders and the Smiths would have the ability to cause us [Sinclair] to take actions in their interest." The Company further admits that "the Smiths could pursue acquisitions, divestitures, or other transactions that, in their judgment, could enhance *their* equity investment, *even though* such transactions might involve risks to our [Sinclair's] *other security holders*."

**RESPONSE NO. 121:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 121, which characterize and selectively quote Sinclair's Annual Reports. The Non-SLC Defendants respectfully refer the Court to that document for a complete and accurate

statement of its contents and description of Sinclair's capital and governance structure and the

stock ownership and voting power of Messrs. Smith.

**PARA. NO. 122:**   By the Company's own admission, the Smith brothers have absolute control over the Company's pursuit of certain transactions and divestitures, even if those transactions and divestitures would solely benefit the Smith brothers at the expense of Sinclair's minority stockholders. This includes the Board's assessment of whether to pursue valid claims for breach of fiduciary duty against the Smith brothers. For this reason, the Board is incapable of assessing a demand because the Smith brothers admittedly can control the outcome of any Board vote.

**RESPONSE NO. 122:**   The Non-SLC Defendants deny the allegations contained in

Paragraph No. 122.

**PARA. NO. 123:**   Further, the Smith brothers are so personally conflicted and committed to the failed transactions at issue herein that they could not be expected to respond to a demand in good faith and within the ambit of the business judgement rule. As alleged herein, the Smith brothers abused their control over the Company and the Board by causing Sinclair to propose and attempt to execute related-party divestitures of certain television broadcast stations in violation of FCC rules for the benefit of the Smith brothers, at the expense of minority stockholders.

**RESPONSE NO. 123:**   The Non-SLC Defendants deny the allegations contained in

Paragraph No. 123.

**PARA. NO. 124:**   According to the Company's public filings, the Smith brothers have owned and continue to own an interest in Cunningham, and therefore Cunningham, as the Company admits, is a "related person." Moreover, the Smith brothers have long-time business connections to Atlantic Automotive and Steven Fader. Sinclair previously had an ownership stake in Atlantic Automotive, and David Smith is currently its controlling stockholder and a member of its board of directors. Further, David Smith is a long-time business partner of Steven Fader.

**RESPONSE NO. 124:**   The Non-SLC Defendants deny the allegations contained in

Paragraph No. 124, except they admit that (a) Sinclair previously held an ownership stake in

Atlantic Automotive but sold that ownership stake in 2005; (b) David D. Smith has a majority

interest in Atlantic Automotive and is a member of its board of directors; and (c) Mr. Smith and

Mr. Fader have certain business relationships.   The Non-SLC Defendants respectfully refer the

Court to Sinclair's Annual Reports, Sinclair's Proxy Statements, the Charter and the By-Laws for

a complete and accurate statement of their contents and description of Sinclair's capital and governance structure and the stock ownership and voting power of Messrs. Smith.

**PARA. NO. 125:**   To skirt FCC rules, the Smith brothers attempted to execute a series of divestitures to Cunningham and WGN-TV, LLC, operated by Steven Fader, for their own benefit, at the expense of minority stockholders. The conflicted transactions at issue in this action personally implicate the Smith brothers in breaches of fiduciary duty for engaging in self-dealing transactions. By proposing to divest certain television broadcast stations to Cunningham and WGN-TV, LLC for less than fair value, the Smith brothers abused their control over the Company and the Board for their own personal benefit, at the expense of the Company and its minority stockholders.

**RESPONSE NO. 125:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 125.

**PARA. NO. 126:**   Because the Smith brothers proposed divestitures that would have resulted in a benefit to themselves personally, they are so personally and directly conflicted by and committed to the failed transactions that they cannot assess a demand in good faith and within the ambit of the business judgment rule.

**RESPONSE NO. 126:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 126.

**PARA. NO. 127:**   While typically a stockholder must make a demand on the board of directors before suing in the name of the Company, here, demand is plainly futile. The Smith brothers, whom the related party transactions were designed to personally benefit, constitute four of the eight members of the Board, and therefore a majority of the Board cannot impartially assess and vote to pursue the claims asserted herein. Under traditional rules of board governance, an equally divided vote on a motion to sue has the same effect as a vote in which the motion is defeated by a one vote majority. In either case, the motion is unsuccessful and does not become corporate policy. For this reason, because a majority of the Board is not independent and disinterested, the Board is so personally conflicted and committed to the failed transactions at issue herein that they could not be expected to respond to a demand in good faith and within the ambit of the business judgement rule.

**RESPONSE NO. 127:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 127.

**PARA. NO. 128:**   While half the Board is conflicted by virtue of being the beneficiaries of the proposed related-party transactions, which is sufficient on its own to excuse demand, Defendants McCanna, Keith, and Leader also have disabling conflicts given their close, decades-long business and professional relationships with the Smith brothers and the Smith family, including:

(a)     Mr. Keith, who is the President and Founder of the Cavanaugh Group, Inc., a Baltimore-based investment advisory firm founded in October 1995. In his role as investment advisor, Mr. Keith has provided investment and management services to three of the Smith brothers and certain corporations owned by one of more of them for at least 17 years.

(b)     Mr. Leader is a retired partner of the law firm Shaw Pittman in Washington, D.C., where he specialized in communications law matters from 1999 to 2002. Mr. Leader was a senior partner with the law firm of Fisher Wayland Cooper Leader & Zaragoza in Washington, D.C. from 1973 to 1999. According to the Company's press release announcing Mr. Leader's appointment to the Board in 2002, from 1968 to 2002, Mr. Leader served as outside FCC counsel to Sinclair and its predecessor companies.

(c)     Mr. McCanna was a shareholder of the accounting firm of Gross, Mendelsohn & Associates, P.A. from 1972 and served as its managing director through June 30, 2009. Mr. McCanna has provided accounting, tax, and related services to the Smith family and corporations owned by them (other than Sinclair) for many years.

**RESPONSE NO. 128:** The Non-SLC Defendants admit the allegations contained in Subsection (a) and (b) and in the first sentence of Subsection (c) of Paragraph No. 128. The Non-SLC Defendants deny the remaining allegations of Paragraph No. 128, except they admit that Mr. McCanna, prior to joining the Board, had conducted audits on two companies affiliated with Mr. Smith and that another partner at Gross, Mendelsohn & Associates, P.A. has provided certain accounting services to entities affiliated with members of the Smith family.

**PARA. NO. 129:** Given the decades-long, substantial professional relationships between Defendants Keith, Leader, and McCanna, on the one hand, and the Smith brothers and Smith family, on the other, Defendants Keith, Leader, and McCanna are so personally and directly conflicted that they could not be expected to respond to a demand in good faith and within the ambit of the business judgement rule.

**RESPONSE NO. 129:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 129.

**PARA. NO. 130:** For these reasons, demand is futile.

**RESPONSE NO. 130:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 130.

**B.**      **The Director and Officer Defendants Face A Substantial Likelihood of Liability for Their Actions or Lack of Actions in Connection with the Sinclair-Tribune Merger**

**PARA. NO. 131:**   The Director Defendants face a substantial likelihood of liability for acting in bad faith by pursuing the interests of the Smith brothers at the expense of the minority stockholders and failing to oversee the Company's compliance with contractual provisions and federal law. For the following five reasons, demand is futile on the Board.

**RESPONSE NO. 131:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 131.

**PARA. NO. 132:**   *First*, as part of the merger transaction and approval process, the Director Defendants likely approved the related party divestitures for the benefit of the Smith brothers. Because the Director Defendants acted for the benefit of the Smith brothers, at the expense of the Company and its minority stockholders, they have acted in bad faith, and therefore face a substantial likelihood of liability.

**RESPONSE NO. 132:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 132.

**PARA. NO. 133:**   *Second*, the Director Defendants permitted the Company to engage in self-dealing, related party divestitures in violation of FCC rules. The Director Defendants received repeated warnings from regulators that the Cunningham and Steven Fader divestitures were in violation of FCC rules, but failed to take any corrective action to ensure approval of the Sinclair-Tribune merger transaction. The Director Defendants signed the Company's public filings, which described Cunningham and Atlantic Automotive as "related persons." The Director Defendants had knowledge of previous FCC enforcement actions in which the federal regulator found that the Company had exercised *de facto* control over Cunningham and found certain sidecar arrangements violative of FCC rules. Most importantly, the Director Defendants were specifically warned by FCC to amend the proposed divestitures to make sure that greater separation existed between Sinclair and the buyer. Rather than heed these warnings, the Director Defendants permitted Sinclair to divest two different stations to the same buyer – Cunningham – knowing full well that the FCC would not approve the divestiture.

**RESPONSE NO. 133:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 133.

**PARA. NO. 134:**   *Third*, the Director Defendants caused the Company to submit materially false or misleading statements to the FCC in connection with the Sinclair-Tribune merger transaction. The Director Defendants failed to include all facts known to the Smith brothers and the Company regarding Sinclair's – more specifically, the Smith brothers' – close business ties to Cunningham and Steven Fader. Further, the Director Defendants failed to disclose the financial relationship between Sinclair and the Smith brothers and Cunningham and Steven Fader.

Ultimately, the FCC found that the Company may have engaged in deception and materially misled the FCC by failing to disclose these facts, resulting in the FCC issuing the hearing designation order.

**RESPONSE NO. 134:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 134 and, to the extent that those allegations characterize the HDO, the Non-SLC Defendants respectfully refer the Court to the HDO for a complete and accurate statement of its contents.

**PARA. NO. 135:**  *Fourth*, the Director Defendants consciously permitted the Company to breach the Merger Agreement by failing to use reasonable best efforts in seeking approval of the Sinclair-Tribune merger transaction. As discussed herein, the Director Defendants permitted the Company to engage in sham divestitures and make materially false statements to the FCC. As a result of these activities, Tribune brought suit in Delaware Chancery Court claiming that Sinclair breached the Merger Agreement and seeking $1 billion in damages. The Company did not move to dismiss the Complaint, but rather immediately submitted an answer. The litigation is currently in discovery.

**RESPONSE NO. 135:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 135, except they admit that Plaintiffs purport to characterize the Tribune Complaint and Sinclair's verified answer and counterclaim in the Tribune Action.  The Non-SLC Defendants respectfully refer the Court to those documents and the docket in the Tribune Action for a complete and accurate statement of their contents.

**PARA. NO. 136:**  *Finally*, the Director Defendants caused the Company to make false and misleading statements to investors regarding the related party divestitures. On numerous occasions, the Director Defendants failed to act to ensure that statements made by the Company's executives were truthful and accurate. Instead, the Director Defendants permitted the Company's executives to routinely misrepresent Sinclair's efforts to use reasonable best efforts to obtain approval of the Sinclair-Tribune merger transaction.

**RESPONSE NO. 136:**  The Non-SLC Defendants deny the allegations contained in Paragraph No. 136.

**PARA. NO. 137:**  For the same reasons discussed in this section, David Smith, Duncan Smith, and Robert Smith, as officers of the Company, face a substantial likelihood of liability for breaching their duty of care. As officers, these defendants are not entitled to receive the benefit of exculpation, and therefore are liable to the Company for any action taken with gross negligence.

Because Dr. Frederick Smith is the brother of these defendants, he is incapable of independently assessing a demand to assert claims against his brothers in their capacities as officers.

**RESPONSE NO. 137:** The Non-SLC Defendants deny the allegations contained in the first and third sentences of Paragraph No. 137 and aver that Robert E. Smith is not an officer of Sinclair. The allegations contained in the second sentence of Paragraph No. 137 are legal conclusions and characterizations of legal arguments and positions. The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 137.

**PARA. NO. 138:** For these reasons, demand is also futile.

**RESPONSE NO. 138:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 138.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### (Against the Director Defendants)

**PARA. NO. 139:** Plaintiff realleges each allegation above, as though fully set forth herein.

**RESPONSE NO. 139:** The Non-SLC Defendants re-allege each response above, as though fully set forth herein.

**PARA. NO. 140:** The Director Defendants owed and owe fiduciary duties to Sinclair and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and continue to owe Plaintiff and Sinclair the highest obligation of due care, loyalty, and good faith in the administration of the Company's affairs, including, without limitation, the duty to honor contractual agreements with parties, comply with the law, and deal truthfully with regulators and stockholders.

**RESPONSE NO. 140:** The allegations contained in Paragraph No. 140 are legal conclusions and characterizations of legal arguments and positions. The Non-SLC Defendants admit that they owe duties but deny that the allegations contained in Paragraph No. 140 are a complete and accurate statement of law.

**PARA. NO. 141:**   The Director Defendants consciously and willfully breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)     Consciously and willfully approving and pursuing related-party divestitures for the benefit of the Smith brothers, at the expense of minority stockholders, and in violation of FCC rules;

(b)     Consciously submitting untruthful applications for approval of the divestitures to the FCC;

(c)     Willfully failing to abide by the terms of the Company's contractual agreement with Tribune, including the willful failure to use best efforts to obtain regulatory approval of the merger transaction; and

(d)     Knowingly issuing false or misleading statements of material fact to Sinclair stockholders regarding the Company's efforts in complying with FCC requests for lawful divestitures.

**RESPONSE NO. 141:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 141.

**PARA. NO. 142:**   As a direct and proximate result of the foregoing breaches of fiduciary duty by the Director Defendants, Sinclair has sustained, and will continue to sustain, significant damages – both financially and to its corporate image and goodwill. Such damages to Sinclair caused by the Director Defendants include, and will include, the substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny (including increased difficulty in receiving or renewing FCC broadcast licenses), and other liabilities described herein.

**RESPONSE NO. 142:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 142.

**PARA. NO. 143:**   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**RESPONSE NO. 143:** The Non-SLC Defendants deny the allegations contained in

Paragraph No. 143.

**COUNT II**
**Breach of Fiduciary Duty**
**(Against the Officer Defendants)**

**PARA. NO. 144:**   Plaintiff realleges each allegation above, as though fully set forth herein.

**RESPONSE NO. 144:** The Non-SLC Defendants re-allege each response above, as though fully set forth herein.

**PARA. NO. 145:** The Officer Defendants owed and owe fiduciary duties to Sinclair and its stockholders. By reason of their fiduciary relationships, the Officer Defendants specifically owed and continue to owe Plaintiff and Sinclair the highest obligation of due care, loyalty, and good faith in the administration of the Company's affairs, including, without limitation, the duty to honor contractual provisions with parties, comply with the law, and deal truthfully with regulators and stockholders.

**RESPONSE NO. 145:** The allegations contained in Paragraph No. 145 are legal conclusions and characterizations of legal arguments and positions. The Non-SLC Defendants admit that they owe duties but deny that the allegations contained in Paragraph No. 145 are a complete and accurate statement of law.

**PARA. NO. 146:** The Officer Defendants consciously and willfully breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a) Consciously and willfully approving and pursuing related-party divestitures for the benefit of the Smith brothers, at the expense of minority stockholders, and in violation of FCC rules;

(b) Consciously submitting untruthful applications for approval of the divestitures to the FCC;

(c) Willfully failing to abide by the terms of the Company's contractual agreement with Tribune, including the willful failure to use best efforts to obtain regulatory approval of the merger transaction; and

(d) Knowingly issuing false or misleading statements of material fact to Sinclair stockholders regarding the Company's efforts in complying with FCC requests for lawful divestitures.

**RESPONSE NO. 146:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 146.

**PARA. NO. 147:** As a direct and proximate result of the foregoing breaches of fiduciary duty by the Officer Defendants, Sinclair has sustained, and will continue to sustain, significant damages – both financially and to its corporate image and goodwill. Such damages to Sinclair caused by the Officer Defendants include, and will include, the substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny (including increased difficulty in receiving or renewing FCC broadcast licenses), and other liabilities described herein.

**RESPONSE NO. 147:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 147.

**PARA. NO. 148:**  As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

**RESPONSE NO. 148:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 148.

<u>**COUNT III**</u>
**Breach of Fiduciary Duty**
**(Against David Smith, Dr. Frederick Smith, Duncan Smith, and Robert Smith**
**in Their Capacities as Controlling Stockholders)**

**PARA. NO. 149:**  Plaintiff realleges each allegation above, as though fully set forth herein.

**RESPONSE NO. 149:** The Non-SLC Defendants re-allege each response contained above, as though fully set forth herein.

**PARA. NO. 150:**  Defendants David Smith, Dr. Frederick Smith, Duncan Smith, and Robert Smith are a coordinated group of investors with familial relationships who have agreed to vote their shares together as a control group. As such, the Smith brothers are the controlling stockholders of Sinclair and they owed and continue to owe Plaintiff and Sinclair the highest obligation of due care, loyalty, and good faith.

**RESPONSE NO. 150:** The Non-SLC Defendants deny the allegations contained in the first sentence of Paragraph No. 150.  The allegations contained in the second sentence of Paragraph No. 150 are legal conclusions and characterizations of legal arguments and positions.  The Non-SLC Defendants deny the allegations contained in the second sentence of Paragraph No. 150.

**PARA. NO. 151:**  By reason of the foregoing, Defendants David Smith, Dr. Frederick Smith, Duncan Smith, and Robert Smith have breached their fiduciary duties by abusing their control over Sinclair in the following ways:

(a)    Proposing and pursuing related-party divestitures for their own benefit, at the expense of minority stockholders, and in violation of FCC rules;

(b)    Consciously submitting untruthful applications for approval of the divestitures to the FCC;

(c)     Willfully failing to abide by the terms of the Company's contractual agreement with Tribune, including the willful failure to use best efforts to obtain regulatory approval of the merger transaction; and

(d)     Knowingly issuing false or misleading statements of material fact to Sinclair stockholders regarding the Company's efforts in complying with FCC requests for lawful divestitures.

**RESPONSE NO. 151:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 151.

**PARA. NO. 152:** Because of the misconduct alleged herein, Defendants David Smith, Dr. Frederick Smith, Duncan Smith, and Robert Smith are liable to the Company for damages resulting directly and proximately from their breaches of fiduciary duties.

**RESPONSE NO. 152:** The Non-SLC Defendants deny the allegations contained in Paragraph No. 152.

## AFFIRMATIVE DEFENSES

The Non-SLC Defendants assert the following affirmative defenses, without assuming the burden of proof on such defenses that would otherwise rest with Plaintiffs, and reserving the right to assert other defenses, claims (including, but not limited to, cross-claims and counterclaims) not asserted herein if and when they become appropriate and/or available. The Non-SLC Defendants incorporate herein all of the factual averments set forth in their Answer.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim against the Non-SLC Defendants upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' putative claims are derivative in nature and Plaintiffs have failed to comply with the requirements of Federal Rule of Civil Procedure 23.1.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' putative claims are derivative in nature and Plaintiffs have failed to make a

demand on Sinclair's Board, as required under applicable law, and demand is not futile.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' putative claims are premature because Sinclair has formed a Special Litigation Committee to investigate the conduct at issue in the Complaint and the Special Litigation Committee has not yet concluded that investigation.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' putative claims are inadequate to overcome and/or are defeated by the business judgment rule and/or by operation of Md. Code Ann., Corps. & Ass'ns § 2-405.1(e) and Md. Code Ann., Cts. & Jud. Proc. § 5-417(b).

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' putative claims against the Individual Defendants are barred by Sinclair's certificate of incorporation and Md. Code Ann., Corps. & Ass'ns § 2-405.2; Md. Code Ann., Cts. & Jud. Proc. § 5-418.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' putative claims fail, in whole or in part, because of a lack of injury in fact and a lack of causation.

### NINTH AFFIRMATIVE DEFENSE

Plaintiffs' putative claim for damages is barred, in whole or in part, because such damages, if any, are speculative and uncertain.

### TENTH AFFIRMATIVE DEFENSE

The Non-SLC Defendants are not liable for any damages allegedly suffered by Plaintiffs because such damages were not legally or proximately caused by any acts or omissions of the Non-SLC Defendants.

## **ELEVENTH AFFIRMATIVE DEFENSE**

The Non-SLC Defendants reserve the right to assert any additional defenses, cross-claims, and third-party claims not asserted herein of which it becomes aware through discovery or other investigation.


Dated: February 14, 2020

  /s/ *Sima G. Fried*
Scott H. Marder, Bar No. 28789
Sima G. Fried, Bar No. 03564
THOMAS & LIBOWITZ, P.A
25 S. Charles St., Suite 2015
Baltimore, Maryland  21201
Telephone: (410) 752-2468
Facsimile: (410) 752-0979
Email: shmarder@tandllaw.com
Email: sfried@tandllaw.com

Scott B. Luftglass (*pro hac vice*)
Harrison D. Polans
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
Email: scott.luftglass@friedfrank.com
Email: harrison.polans@friedfrank.com

*Counsel for David D. Smith, Frederick G. Smith, J. Duncan Smith, Robert E. Smith, Howard E. Friedman, Daniel C. Keith, Christopher S. Ripley, and Nominal Defendant Sinclair Broadcast Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of February, 2020, I cause the foregoing document to be filed electronically via the Court's CM/ECF system, which will effect service on all counsel of record.

  /s/                                                    
Sima G. Fried